**In the United States District Court
for the District of Colorado**

Civil Action No. 19-cv-3346-RBJ

Cl.G. on behalf of his minor son, C.G., the aggrieved
party,

      Plaintiff,

v.

Scott Siegfried, Superintendent of Cherry Creek
School District,

Carla Stearns, Executive Director of High School
Education at Cherry Creek School District,

Chris Smith, Chief of Staff for the Educational
Services Center of Cherry Creek School District,

Ryan Silva, Principal of Cherry Creek High School,

Kevin Uhlig, Assistant Principal at Cherry Creek
High School,

Brynn Thomas, Dean at Cherry Creek High School,

Board of Education for the Cherry Creek School
District,

and

Cherry Creek School District No. 5,

      Defendants.

---

## AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff Cl.G., on behalf of minor child C.G., by and through his attorneys, Stimson Stancil LaBranche Hubbard, LLC, respectfully submits the following Amended Complaint:

## Introduction

1.   "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397 (1989). "Speech may not be banned on the ground that it expresses ideas that offend." *Metal v. Tam*, 137 S.Ct. 1744, 1751 (2017).

2.   A foundational core of our democracy is that the State cannot punish its citizens for engaging in conduct or using speech that is protected by the First Amendment. Just as citizens cannot be criminally punished for protected speech, a public school cannot discipline its students for speech or conduct that falls within the ambit of the First Amendment.

3.   On a Friday night in the fall of 2019, C.G., a student at Cherry Creek High School, was at a thrift store with friends shopping for costumes. C.G. took a picture of his friends wearing silly hats, added a caption to the picture, and posted it to his private social media account on Snapchat.

4.   C.G.'s post caught the attention of one of his social media connections. She took a screenshot of the photo and caption and showed it to her father, who spread it to others in the Jewish community.

5.   Arapahoe County Sheriff's Office received a call about the post. The investigating officer quickly concluded that the caption was intended as a joke and that C.G. was not a threat to anyone.

6.   School officials were contacted about the post. Even though the photo was taken off-campus over a weekend and posted to a private social media account using C.G.'s privately owned phone, and law enforcement determined there was no threat, the District suspended C.G. for his offensive post. After a botched process that violated District Policy and C.G.'s Due Process rights, C.G. was expelled from Cherry Creek High School for his off-campus speech.

7.   C.G.'s speech was protected by the First Amendment. Suspending and expelling him based solely on his off-campus speech conduct violated C.G.'s right to freedom of speech and expression.

**Jurisdiction and Venue**

8.   This is an action for declaratory and injunctive relief and monetary damages, including attorneys' fees, brought pursuant to Title 42 U.S.C. §§ 1983 and 1988 and 28 U.S.C § 2201 and 2202 and the laws and common law of the United States and the state of Colorado.

3

9.   Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331, 1343 and 1367. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

10.   Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). The events relevant to the claims contained herein occurred within the State of Colorado.

11.   Plaintiff asserts that the violation of his Constitutional rights was committed as a result of the actions of Scott Siegfried, Carla Stearns, Chris Smith, Ryan Silva, Kevin Uhlig, Brynn Thomas and the Cherry Creek School Board, and other officials known and unknown at Cherry Creek High School and in the Cherry Creek School District, as well as Cherry Creek School District's policies, procedures, and lack of procedures and its failure to train, hire and/or supervise its employees.

**Parties**

12.   C.G. is a minor child, a citizen of the United States and at all times relevant to this Complaint, a resident of Colorado.

13.   Cl.G. is C.G.'s parent, a citizen of the United States, and at all times relevant to this Complaint, a resident of Colorado.

14.   Defendant Cherry Creek School District No. 5 ("CCSD") is a public school system and the governmental body responsible for operating Cherry Creek High School ("CCHS"). The District's offices are located at 4700 South Yosemite Street, Greenwood Village, Colorado 80111.

4

15.  The Board of Education (the "School Board") for the Cherry Creek School District is an elected body that adopts and promulgates the policies and practices, including implementation thereof and training thereon, that govern operations in the CCSD. The Board's offices are located at 4700 South Yosemite Street, Greenwood Village, Colorado 80111.

16.  Defendant Scott Siegfried is the Superintendent of CCSD. Siegfried is a resident of Colorado and is a defendant in his individual and official capacities.

17.  Defendant Carla Stearns is the Executive Director of High School Education for CCSD. Stearns is a resident of Colorado and is a defendant in her individual and official capacities.

18.  Defendant Chris Smith is the Chief of Staff for CCSD's Educational Services Center. Smith is a resident of Colorado and a defendant in his individual and official capacities.

19.  Defendant Ryan Silva is Principal of CCHS. Silva is a resident of Colorado and is a defendant in his official and individual capacities.

20.  Defendant Kevin Uhlig is Assistant Principal of CCHS. Uhlig is a resident of Colorado and is a defendant in his individual and official capacities.

21.  Defendant Brynn Thomas is a Dean at CCHS. Thomas is a resident of Colorado and is a defendant in her individual and official capacities.

**General Allegations**

Cherry Creek School District Policies

22.    The mission of the Cherry Creek School District is "to inspire every student to think, to learn, to achieve, to care."

23.    CCSD—through the School Board—adopted a series of policies governing student behavior on and off campus. The Board is the final decision-makers with respect to the District's policies. Violating certain policies can result in suspension or expulsion for a student.

24.    District Policy JDK-1-E, *Grounds for Suspension, Expulsion or Denial of Admission*, states that a student may be suspended or expelled for "behavior on or off school property which is detrimental to the welfare or safety of other pupils or of school personnel including behavior which creates a threat of physical harm to the child or to other children."

25.    District Policy JICDA, *Conduct and Discipline Code*, provides that a principal may suspend or recommend expulsion of a student who, while in school buildings, on school grounds, in school vehicles, or during a school-sponsored activity: (1) engages in verbal abuse, i.e., name calling, ethnic or racial slurs, or derogatory statements addressed publicly to others that precipitate disruption of the school program or incite violence; or (2) engages in behavior on or off school property that is detrimental to the welfare, safety, or morals of other students or school personnel.

6

26.   District Policy ACC-R regulates "intimidation, harassment and hazing" on school grounds or at school-sponsored events. A student can violate ACC-R by directing an obscene gesture at another person or insulting, taunting or challenging another person while on school grounds or at a school-sponsored event. ACC-R is also violated when a student, while on school grounds or at a school-sponsored event, threatens another person with physical harm.

27.   Except in very limited circumstances not applicable here, a student cannot be suspended or expelled without a hearing. Suspension of less than ten days requires only an informal hearing; a longer suspension or expulsion requires a formal hearing.

28.   Following any decision to suspend a student, District Policy JKD-1-R requires that the student's parents be notified of the suspension and that such notification include "the time and place for the parent, guardian, or legal custodian to meet with the suspending authority to review the suspension."

29.   The School Board delegated to each principal the authority to suspend a student for up to ten days if the student has committed a drug offense, robbery, or assault, or brought a dangerous weapon on school grounds, in a school vehicle or at a school activity or sanctioned event. For any other grounds, a principal may suspend a student for a maximum of five days.

30.   Under authority delegated by the School Board, Siegfried can suspend a student for an additional ten school days. District Policy allows Siegfried to extend a

7

suspension for an additional ten school days only if he chooses to present the matter to the next meeting of the board of education.

31.   Siegfried delegated his authority to conduct expulsion hearings to a district-retained hearing officer. The hearing officer is required to forward findings of fact and recommendations to Siegfried at the end of the hearing. Siegfried must render a written decision on whether to expel the student within five days after the expulsion hearing.

The Picture, Caption and Snapchat Post

32.   C.G. is a minor who attended Cherry Creek High School until he was expelled by the Superintendent on October 21, 2019. C.G.'s expulsion was confirmed by the School Board on December 3, 2019.

33.   C.G. was expelled because he posted a photo with an offensive caption to his personal Snapchat page using his personal phone when he was off-campus and not at a school-sponsored event.

34.   On September 13, 2019, a Friday evening, C.G. was at a local thrift shop with friends from school. They were goofing around, acting silly, and trying on various costume sort of items.

35.   Three of his friends tried on silly hats. One wore an oversized floppy hat patterned after the American flag. Another wore a long-haired blonde wig. The third boy's hat resembled a foreign military hat from the World War II period.

36.    The boys asked C.G. to take their picture and post it to Snapchat. C.G. assented and took a photo of his friends smiling and wearing their hats. Before posting the photo to Snapchat, C.G. added a caption patterned after the popular "Me and the Boys" meme, stating: "Me and the boys bout to exterminate the Jews."

37.    C.G.'s caption was inspired by the foreign military hat from the World War II period. C.G. intended the caption to be humorous; he believed it was so outrageous no one could possibly take his words seriously.

38.    C.G. posted the photo and caption to his private Snapchat story feed. Only Snapchat users connected with C.G. could view the image.

39.    Stories posted to Snapchat's stories function expire after 24 hours. If left untouched, the photo would have been automatically deleted from C.G.'s Snapchat account on Saturday evening. However, the photo was removed within hours of it being posted.

40.    C.G.'s caption was not directed towards anyone. C.G. did not send the photo with the caption directly to anyone or tag anyone in the photo.

41.    C.G. did not tag CCHS or CCSD in the photo or otherwise try to link the photo to CCHS or CCSD. No employees of the District appear in the photo. No employees of the District are tagged in the photo. C.G. did not send the photo to any employee of the District.

42.   No guns or other dangerous objects appear in the photo. The boys depicted in the photo are smiling, wearing athletic clothes and sneakers, and appear to be goofing around. Nothing about the boys' clothing or appearance linked them to CCSD, CCHS or any of its sports teams or other activities.

Fall Out from the Snapchat Post

43.   People who were "friends" with C.G. on Snapchat were able to view the photo and its caption on his Snapchat story. One of his Snapchat "friends" took a screenshot of the post and showed it to her father, who called the police.

44.   Officers responded to C.G.'s house and determined there was no threat against anyone. Within 90 minutes of being contacted about the Snapchat post, the responding officer determined no crime had been committed.

45.   Upon learning people had a negative reaction to his post, C.G. posted an apology to his Snapchat story that stated: "I'm sorry for that picture it was ment [sic] to be a joke." This apology was posted on September 13, within hours of the original post.

46.   School officials knew that C.G. posted the photo and an apology while he was off-campus, during non-school hours. The officials recognized that they were limited in their ability to regulate this off-campus because schools (and school officials) are not the moral compass of the community. In an email sent Sunday evening, Principal Ryan Silva stated:

> When an incident happens off campus, we have to make sure there is a nexus to school. This is the case because our primary function is not to police the community. If we can make a case that there is a nexus to school, we can address a situation that happened away from school. In this case, I feel the learning environment has been impacted.

47.   Before hearing anything from C.G. or the students in the photo, district officials, including at least Defendants Silva, Uhlig and Thomas, decided to suspend C.G. for five school days.

48.   Early Monday morning, CCHS's School Resource Officer sent Assistant Principal Kevin Uhlig a copy of the captioned photo, as well as C.G.'s subsequent post apologizing for the photo and stating that it was intended to be a joke. Uhlig forwarded the email with its attachments to other school officials.

49.   On Monday morning, because C.G. was not a threat to anyone at CCHS, C.G. was allowed to drive himself to school, park his car in a school parking lot, walk past an exterior security booth between the parking lot and the building, enter the school, and walk down the hallways past the School security office and all the way to his first period class. C.G. carried his backpack from his car to his classroom without anyone searching it or otherwise attempting to remove it from him.

50.   Security met C.G. at his first period class and escorted him to Dean Thomas's office. No one searched his backpack upon entering the office.

51.   Thomas notified C.G. that he was suspended for five days (through September 20, 2019) while CCHS investigated how his off-campus speech impacted the school environment. After C.G. had been in Thomas's office for hours, and after he was notified

11

of the five-day suspension, security officials searched C.G.'s backpack. Nothing suspicious, illegal, or dangerous was located.

52.   Despite previously acknowledging that C.G.'s Snapchat post occurred off-campus, over a weekend when school was not in session, and not during at school-sponsored activity, C.G.'s five day suspension was premised on a supposed violation of District Policy JICDA-13, which prohibits verbal abuse by a student while in school buildings, on school grounds, in school vehicles, or during a school-sponsored activity. By its own terms, JICDA-13 does not apply to off-campus speech.

53.   C.G. was not given the opportunity to appeal this decision despite the fact that JICDA-13 clearly did not apply to the conduct at issue here because school officials knew the speech at issue occurred off-campus, on a weekend, and was not connected with any school event.

54.   By 10:30 a.m. on Monday, September 16, 2019, school officials (including Silva, Uhlig and Thomas) had decided to recommend expulsion for C.G. based on the Snapchat post. Uhlig sent an email to Carla Stearns that morning stating his desire to "go for an expulsion review on [C.G.]."

55.   At the time this decision was made, Defendants had been contacted by one family of a CCHS student. There had been no media coverage of the Snapchat post.

Defendants Caused Nearly All of the Impact on the School Environment

56.     Over the weekend of September 13-15, 2019, the parents of one CCHS student contacted school officials. These parents contacted Principal Silva the evening of September 15, 2019 and asked the school to use this incident as "an opportunity for respectful dialogue, to meet people where they are, and figure out how we can move forward." The parents emphasized a need to show the public that "our schools are no place for hate" and asked the school to use this incident to address the rise in hate speech and hate crimes in the Cherry Creek community.

57.     There was no media coverage of C.G.'s Snapchat post over the weekend.

58.     The afternoon of Monday, September 16, 2019, hours after C.G. was suspended and after CCHS officials (including Silva, Uhlig and Thomas) decided to pursue expulsion of C.G., Principal Silva sent a communication to the entire CCHS community making them "aware of an anti-Semitic social media post over the weekend" that happened outside of school. Principal Silva explained that the school "was investigating to determine the impact on the school environment and will take appropriate action." He expressed that CCHS "does not tolerate hateful speech or actions" and expressed his desire to "partner to take a stand against hate and to fight for the values that define Cherry Creek High School: acceptance, care, respect for diversity, and learning."

59.     Principal Silva's September 16, 2019 email to parents was released to the media. In the days following, multiple news outlets ran stories covering the Snapchat post

13

and CCSD's "investigation." Every article published by a news source referenced Principal Silva's statement. Many articles also included a statement from the Arapahoe County Sheriff's Office stating its belief that the reference to "exterminating the Jews" was not a credible threat.

60.   After Principal Silva's email blast, three additional parents contacted the School and asked school officials to use this incident to promote tolerance in the CCHS community. Parents offered to bring in a holocaust survivor, suggested movies that could be shown as educational opportunities, and referenced books that could be read by students. Only one parent pressed school officials to take disciplinary action against C.G.

61.   School officials decided to use this incident as a learning experience for CCHS students. Prior to this incident, after experiencing multiple tragedies, including two student suicides, during the 2018-2019 school year, CCHS started the 2019-2020 school year by implementing a new advisory period twice a week. Recognizing the students' desire for real human connections, the School sought to allow time for extended conversations between students and staff and to encourage relationships to develop over the entirety of a student's high school experience. By implementing the advisory period, CCHS hoped to enhance the climate, culture, health and wellness of its students.

62.   The advisory period is held every Monday and Wednesday for 30 minutes. This period was not intended to be instructional time; the School sought to use the

advisory period to manage the administrative and counseling tasks that have historically interrupted educational time.

63.   On Monday, September 23, 2019, CCHS used the advisory period to discuss the impact of hate and how hate speech affects people. C.G.'s Snapchat post offered students a recent, real-life example of how a spur-of-the-moment social media post could change a student's life. C.G's post furthered CCHS's educational mission as it served as a springboard to encourage a real conversation between students and faculty about offensive and insensitive speech.

CCHS Improperly Disciplined C.G. for Protected Speech

64.   On September 18, 2019, Dean Thomas informed C.G.'s mother that C.G.'s suspension was being extended for five additional days (through September 27, 2019) to facilitate an expulsion review process. Kevin Uhlig sent a follow-up letter confirming this decision. No authority was cited for the additional five-day suspension; Thomas and Uhlig again disciplined C.G. under the inapplicable JICDA policy that applied only to conduct on school property.

65.   C.G. was not given the opportunity to appeal Thomas and Uhlig's decision. In violation of JKD-1-R, C.G.'s parents were not given notice of a time and place they could meet with Thomas or Uhlig to review the suspension.

Case 1:19-cv-03346-RBJ   Document 30   Filed 02/28/20   USDC Colorado   Page 16 of 35

66.    The same day, Defendant Smith notified C.G. that his suspension was being extended an additional eleven school days (through October 21, 2019[1]) to allow for completion of the expulsion review process. C.G. was not given an opportunity to appeal the extension of his suspension. In violation of JKD-1-R, C.G.'s parents were not given notice of a time and place they could meet with Smith or any other District official to review the suspension.

67.    C.G. and his parents repeatedly attempted to engage Defendants and other CCHS and CCSD officials about the Snapchat post. C.G. and his parents sought to work with the School to make this incident a learning and a growth experience, as other community members had previously suggested. CCHS and CCSD officials, including Defendants, rebuffed these efforts at every turn.

68.    On September 23, 2019, Siegfried, Smith, Sterns, Silva, Uhlig and Thomas and other District officials were sent a packet of information by C.G.'s parents that included the following:

  a. A letter from C.G. in which he took full responsibility for the Snapchat post. C.G. apologized for his conduct and explained the Snapchat past was a stupid, impulsive lapse in judgment that was never intended to hurt anyone. C.G. stated that he had spent time since the post talking directly

---

[1] Cherry Creek High School's fall break was scheduled for October 14-18, 2019. The days during fall break were not counted as "school days" for purposes of C.G.'s suspension.

with Jewish members of the community to understand how his words

impacted them, reading books about the Holocaust to improve his

knowledge, and educating himself about the efforts of the Anti-Defamation

League and other Jewish-oriented advocacy groups.

b.   A letter from C.G.'s parents explaining that the Snapchat post was a

juvenile attempt at dark humor that C.G. realizes was wrong and for which

C.G. is remorseful. C.G.'s parents reiterated the journey of education and

understanding C.G. had engaged in since the post. C.G. and his parents

asked for a process of restorative justice with the school, students and

community members.

c.   Letters from community members who know C.G. and his family. These

community members—like the CCHS parents who had directly contacted

the school—implored Defendants, CCHS, and CCSD to turn this incident

into a learning opportunity from which C.G. could grow and an educational

opportunity for the community at large.

69.   On September 24, 2019, C.G.'s mother followed up on the information

provided the day before and asked for a meeting with District officials. Carla Stearns,

CCSD's Director of High School Education, called C.G.'s mother and explained there

would be no meeting with C.G. or his family. Stearns refused to explain her decision,

stating that there was "no need" for additional discussion and noting that C.G. was set for an expulsion hearing.

70.   An expulsion hearing was conducted on October 7, 2019. During that hearing Kevin Uhlig testified under oath that the School was entitled to regulate off-campus speech if it had a "nexus" with the school environment. He acknowledged the word "nexus" does not appear in any District policy but said that CCHS goes beyond the language of the policies and is "looking too at the nexus on how it impacts students."

71.   Uhlig testified that, at the time he made the decision to pursue expulsion against C.G., he was unaware that C.G. had posted an apology to his Snapchat feed. Uhlig concealed the fact that, four hours before he decided to recommend expulsion, he received a screenshot of C.G.'s apology post via email and forwarded that screenshot to other school officials.

72.   Uhlig also testified C.G.'s Snapchat post caused "extreme outcry of concerned community members and students … over fear to come to school. Fear to access education." He did not reference any specific support for this comment because none exists. No student expressed fear about coming to school in the wake of the Snapchat post and no student was afraid to access education.

73.   At the expulsion hearing, C.G. asserted that his speech was protected by the First Amendment. On this point, after considering the evidence presented, the hearing officer found:

    a.   When C.G. posted the photo and caption, he was not on campus or at a school-sanctioned activity;

    b.   C.G. did not use a device or website related to CCSD or CCHS to post the photo;

    c.   C.G. did not tag CCHS or CCSD or any employee thereof in his post;

    d.   There was no evidence to show C.G.'s actions were directed towards CCHS, any CCHS activity or the CCSD community;

    e.   C.G. did not make a specific threat to any individual in his post.

Despite these findings, the hearing officer concluded that she could not determine issues of law, such as whether C.G.'s speech was protected by the First Amendment.

74.   The hearing officer found that JICDA(13)—the provision relied on by Thomas for C.G.'s initial suspension and by Uhlig for the first extension of C.G.'s suspension—applied to behaviors engaged in while students are in school buildings, on school grounds, in school vehicles, or during a school-sponsored activity. Because C.G.'s conduct occurred off-campus and was not associated with any CCHS activity or event, the hearing officer found C.G. had not violated JICDA(13).

75.   The hearing officer did find, however, that C.G. violated other CCSD policies and recommended expulsion. Again, the hearing officer did not believe it was within her purview to consider the First Amendment and whether C.G.'s speech was protected.

76.   Colorado law and District policy require the Superintendent to review the hearing officer's factual findings and recommendation and issue a written decision within five days of the hearing.

77.   On October 21, 2019, fourteen days after the expulsion hearing, Superintendent Siegfried notified C.G. that he was expelled from CCHS for one year. Dr. Siegfried found C.G.'s actions violated: (1) JICDA(13) prohibiting verbal abuse in a school building or on school property (which the hearing officer found did not apply and for which Siegfried offered no explanation as to why he was overruling the hearing officer's finding); (2) JICDA(19) regulating "behavior on or off school property which is detrimental to the welfare, safety or morals of other students or school personnel"; (3) ACC-R's prohibition on intimidation, harassment or hazing by directing an obscene comment or gesture at another person or insulting or challenging another person or by threatening another person; and (4) JKD-1-E, which allows for suspension, expulsion or denial of admission for behavior on or off school property that is detrimental to the welfare or safety of other pupils or of school personnel including behavior that creates a threat of physical harm.

78.   C.G. appealed Siegfried's decision to expel him to the School Board. A hearing was held on December 2, 2019 in which all Board members—including Egan, McDonald, Garland, Bates, and Fisher—were present. The same day, the School Board voted to affirm Siegfried's decision to expel C.G. for one year. No written findings were made nor was any written explanation of the School Board's decision provided to C.G. or his family.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. §1983**
**Violation of the First and Fourteenth Amendments**
**(Against Thomas, Uhlig, Silva, Stearns, Smith, Siegfried, and the Board of Education)**

79.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

80.   At all times relevant to the allegations in this Complaint, Defendants acted under color of state law.

81.   Defendants are persons under Title 42 U.S.C. § 1983.

82.   C.G. had a constitutionally protected and clearly established right to express himself freely outside of school, school activities or school-sponsored events and not be subject to discipline for such speech.

83.   C.G.'s Snapchat post was a form of speech protected by the First Amendment.

84.   C.G. posted to his personal Snapchat feed using his personal cell phone during non-school hours when he was not at a school-sponsored event or activity.

85.   C.G.'s Snapchat post was not directed towards or linked to CCHS or CCSD in any way.

86.   C.G.'s Snapchat post did not cause any material disruption to education at CCHS or substantially interfere with the work of the school.

87.   Dean Thomas, Assistant Principal Uhlig, Principal Silva, Chief of Staff Smith, Executive Director Stearns, Superintendent Siegfried, and the School Board members

violated C.G.'s First Amendment rights by suspending, expelling and affirming his expulsion from CCHS based on C.G.'s protected speech.

88.    Dean Thomas, Assistant Principal Uhlig, Principal Silva, Chief of Staff Smith, Executive Director Stearns, Superintendent Siegfried, and the School Board members were final decision-makers and policy-makers for CCSD at various stages in the suspension/expulsion process.

89.    A direct causal link exists between Defendants' decision to suspend/expel C.G. and the injuries alleged.

90.    Defendants' actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard to C.G.'s federally protected rights.

91.    Defendants attempted to justify their actions by deceitful means, and in some instances, perjured testimony as to the facts in this situation.

92.    Defendants' conduct violated C.G.'s clearly established rights of which reasonable school officials knew or should have known.

93.    Plaintiff was and continues to be damaged by Defendants' violation of C.G.'s First Amendment rights.

94.    As a direct result of Defendants' unlawful actions as described above, C.G. and his family suffered actual economic and emotional injuries, in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
## 42 U.S.C. § 1983
## First and Fourteenth Amendment Violations
## (Against the Board of Education and Cherry Creek School District)

95.   Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

96.   CCSD, the School Board acted under color of state law when implementing and enforcing its policies.

97.   CCSD and the School Board violated C.G.'s right to freedom of speech and expression, as guaranteed by the First and Fourteenth Amendments, by suspending and expelling him for posting a captioned photo to his private social media account from his personal cell phone at an off-campus location over a weekend completely unrelated to any school activity or event.

98.   The School Board is responsible for adopting policies and procedures that govern the District, including student discipline. The School Board is the final decision/policy-makers with respect to CCSD policies, procedures, and practices.

99.   CCSD's policies and practices—including but not limited to JICDA(13), JICDA(19), ACC-R and JKD-1-E—violate the First Amendment by allowing students to be suspended or expelled for speech that occurs off-campus, unconnected to a school-sponsored event or activity.

23

100.   CCSD's policies and procedures violate students' First Amendment rights because they infringe on a substantial amount of speech protected by the First Amendment.

101.   CCSD and the School Board violated C.G.'s First Amendment rights by enacting policies that go far beyond any reported decision of the United States Supreme Court or the Tenth Circuit Court of Appeals and infringe on protected speech.

102.   CCSD's policies—adopted by the School Board—operate to force C.G. and other students to curtail their off-campus speech and expression in a manner prohibited by the First Amendment.

103.   CCSD and the School Board failed to properly train, hire, and/or supervise CCHS officials regarding the proper policies, procedures and limitations on student discipline, including the need to protect student's First Amendment rights.

104.   The failure to properly hire, train, and supervise its school officials was a moving force of the constitutional violations alleged herein and was a direct and proximate cause of C.G.'s injuries.

105.   CCSD and the School Board have a practice of disciplining students for speech or conduct protected by the First Amendment. For example, officials at another high school in CCSD recently suspended a student for five days for posting a photo to social media showing her posing with her military-veteran older brother while they both held legally-owned firearms. The photo was captioned with language stating the student

was "going to the gun range to practice gun safety and responsible gun ownership." Nothing about the language in the caption was threatening or directed to another person. The photo was taken off-campus during non-school hours and posted to the student's social media account using her privately-owned device. The student was not wearing school gear and did not link her post to any CCSD school, facility, or school-sponsored activity. The violation of this student's First Amendment rights demonstrates the pattern and practice of unconstitutional decision-making on the part of CCSD and the School Board.

106.   CCSD officials do not apply the District's policies as written. Rather, CCSD employees believe they are entitled to regulate any and all speech or conduct that has a "nexus" to the school environment. To CCSD employees, all that is required to form a "nexus" to the school community is involvement of a student. CCSD and the School failed to train and/or supervise employees on appropriate enforcement of District policies.

107.   The actions of CCSD and the School Board have injured and continue to injure C.G. Unless the disciplinary action against C.G. is rescinded, withdrawn or otherwise expunged, these unlawful actions will become a permanent part of C.G.'s academic record.

108.   The actions of CCSD and the School Board are causing and, if not enjoined, will continue to cause C.G. great and irreparable injury that cannot fully be compensated or measured in monetary terms. C.G. has no adequate remedy at law.

109.   C.G. is entitled to preliminary and permanent injunctions prohibiting further violations of his First and Fourteenth Amendment rights.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourteenth Amendment – Procedural Due Process
### (Against all Defendants)

110.   Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

111.   Defendants were acting under color of state law in their actions and inactions, which occurred at all times relevant to this action.

112.   By their actions and inactions described herein, Defendants deprived C.G. of his rights under the Fourteenth Amendment.

113.   Students in public school are entitled to procedural due process under the Fourteenth Amendment when they are removed from a public school environment.

114.   Defendants Thomas, Uhlig, Silva, Stearns, Smith, and Siegfried did not follow the timing or substance of CCSD policies regarding suspension and expulsion.

115.   The School Board took no action to rectify its employees' disregard of District policy.

116.   The actions of Thomas, Uhlig, Silva, Stearns, Smith and Siegfried violated state laws regarding the process required before a student can be suspended or expelled from a public school.

26

117.   Under the Fourteenth Amendment, C.G. was entitled to notice of the charges against him and a fair hearing to plead his case prior to being suspended or expelled.

118.   C.G. did not receive adequate notice of the charges against him or a fair hearing before he was suspended from CCHS by Thomas or before his suspension was extended multiple times by Uhlig and Smith. On information and belief, Silva, Sterns and Siegfried were also involved in the decision to initial suspend C.G. and/or extend C.G.'s suspension.

119.   C.G.'s conduct did not violate any of the above listed policies. His conduct occurred away from school and was unrelated to any school activity or event. C.G.'s insensitive remark in a social media post was not detrimental to the welfare, safety, or morals of other students or school personnel.

120.   C.G.'s suspension for conduct that occurred off-campus and away from any school-related or school-sponsored activity did not violate JICDA(13), the policy relied on to justify C.G.'s initial five day suspension and the extension of that suspension for another five days.

121.   Defendants Thomas, Uhlig, Silva, Stearns, Smith and Siegfried did not offer C.G. an avenue or appeal process to challenge his initial suspension or the multiple extensions of his suspension.

122.   Defendants Thomas, Uhlig, Silva, Stearns, Smith and Siegfried did not give C.G. or his parents notice of a time and place to meet with the suspending authority to discuss the initial suspension or any extension of that suspension.

123.   Defendants Thomas, Uhlig, Silva, Stearns, Smith, Siegfried, and the School Board each had final decision-making authority on behalf of CCSD and the School Board at various stages in the process concerning C.G.'s discipline.

124.   When Defendants Thomas, Uhlig, Silva, Stearns, Smith, and Siegfried made a disciplinary decision as to C.G., they were acting as the final decision/policymaker for CCSD and the School Board.

125.   Defendants' actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard to C.G.'s federally protected rights.

126.   In their attempt to justify their punishment of C.G., Defendants repeatedly exaggerated or obscured facts and engaged in perjury.

127.   Defendants' conduct violated C.G.'s clearly established rights of which reasonable school officials knew or should have known.

128.   C.G. was and continues to be damaged by Defendants' violation of his Fourteenth Amendment rights.

129.   As a direct result of Defendants' unlawful actions described above, C.G. has suffered actual emotional and economic injuries, in an amount to be proven at trial.

28

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment – Procedural Due Process**
**(Against CCSD and the Board of Education)**

130.   Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

131.   Defendants were acting under color of state law in their actions and inactions, which occurred at all times relevant to this action.

132.   The School Board is responsible for adopting policies and procedures that govern the District, including student discipline. The School Board is the final decision/policy-makers with respect to CCSD policies, procedures, and practices.

133.   CCSD's policies and procedures—adopted by the School Board—serve as the basis for discipline but are written so vaguely and broadly that students and parents receive inadequate notice of what conduct may result in an offense.

134.   CCSD's policies and procedures are unconstitutionally overbroad because they provide school officials unbridled discretion to discipline students, up to and including suspension and expulsion, without limitation, objective criteria, or due process.

135.   To the extent CCSD's policies and procedures allow students to be disciplined for off-campus speech, such policies and procedures are unconstitutionally overbroad because they infringe on a substantial amount of speech protected by the First Amendment.

136.    CCSD's policies and procedures are unconstitutionally overbroad because the language used is ambiguous and criteria for discipline are entirely subjective, such that countless constitutionally protected activities may fall within the permitted zone of discipline.

137.    CCSD's policies and procedures are unconstitutionally overbroad because they do not allow a person of ordinary intelligence to determine what conduct the policies prohibit, and because the policies authorize arbitrary and overzealous enforcement.

138.    CCSD, the School Board's actions in this case, including the policies, procedures and practices referenced herein, have injured and continue to injure C.G. Unless the disciplinary action against C.G. is rescinded, withdrawn or otherwise expunged, these unlawful actions will become a permanent part of C.G.'s academic record.

139.    CCSD's and the School Board's conduct is causing and, if not enjoined, will continue to cause C.G. great and irreparable injury that cannot fully be compensated or measured in monetary terms. C.G. has no adequate remedy at law.

140.    C.G. is entitled to preliminary and permanent injunctions prohibiting further violations of his First and Fourteenth Amendment rights.

**FIFTH CLAIM FOR RELIEF**
**42 U.S.C. §§ 1983**
**Conspiracy To Violate C.G.'s Civil Rights (1st and 14th Amendment Violations)**
**(Against All Defendants)**

141.   Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

142.   Defendants were acting under color of state law in their actions and omissions, which occurred at all times relevant to this action.

143.   Defendants recklessly, knowingly, intentionally, willfully and wantonly conspired with one another, and others, to deprive C.G. of his First and Fourteenth Amendment rights under the United States Constitution by taking affirmative steps to create a disruption to the school environment in an effort to justify C.G.'s suspension and expulsion, including but not limited to:

a.   Disseminating information about C.G.'s social media post;

b.   Promoting media coverage of C.G.'s post, the investigation by law enforcement, and the District's "investigation" into the post's impact on the school community;

c.   Encouraging parents to reach out to the school and school administrators about C.G.'s post;

d.   Interrupting regularly scheduled meetings of student groups to inject additional discussion of C.G.'s post;

e.   Requesting the three students depicted in the photo voluntarily absent themselves from CCHS in the days following the post;

f.   Choosing to devote an advisory period to discussing hate speech and the impact of hate speech;

g.   Mischaracterizing the incident as a "threat" situation when they knew no such "threat" existed;

h.   Overstating the number of students emotionally impacted by the post;

31

   i.   Exaggerating the severity of post's impact on students and the overall school community;

   j.   Inflating the number of communications received from parents of CCHS students; and

   k.   Making false and misleading statements under oath in an effort to justify wrongful actions taken by CCHS and District officials against C.G.

144.   CCSD and the School Board failed to properly train, hire, and/or supervise its school officials regarding the proper procedures and limitations on student discipline, including the need to protect student's First Amendment rights.

145.   CCSD and the School Board's failure to properly hire, train, and supervise its employees, including but not limited to Defendants Seigfried, Smith, Stearns, Silva, Uhlig and Thomas—was a moving force of the constitutional violations alleged herein and was a direct and proximate cause of C.G.'s injuries.

146.   A direct causal link exists between the injuries alleged and Defendants' decision to suspend, C.G., expel C.G., and affirm C.G.'s expulsion.

147.   Defendants' actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard to C.G.'s federally protected rights.

148.   Defendants' conduct violated C.G.'s clearly established rights of which reasonable school officials knew or should have known.

149.   Plaintiffs were and continue to be damaged by Defendants' violation of C.G.'s First Amendment rights.

150.    As a direct result of Defendants' unlawful actions as described above, C.G. and his family suffered actual economic and emotional injuries, in an amount to be proven at trial.

## Relief Requested

C.G. respectfully requests that the Court enter judgment in his favor and against Defendants, and award him all relief as allowed by law, including but not limited to the following:

A.    A declaration that Defendants violated C.G.'s First and Fourteenth Amendment rights under the United States Constitution;

B.    An injunction rescinding all disciplinary action taken against C.G. as a result of his constitutionally protected speech and removing from C.G.'s academic record any reference to a suspension and/or expulsion;

C.    An injunction requiring CCSD to immediately lift all restrictions on C.G.'s readmission to a high school in the District;

D.    An injunction prohibiting Defendants and their agents from enforcing CCSD's unconstitutionally vague and overbroad policies;

E.    An injunction requiring CCSD and/or the School Board to accept and add to C.G.'s academic record any credits C.G. earns from another accredited institution, regardless of whether C.G. was also enrolled in CCSD during the relevant period;

33

F.    All appropriate equitable relief including changes to CCSD's policies concerning off-campus speech and other declaratory and injunctive remedies, as appropriate;

G.    Actual economic damages as established at trial;

H.    Compensatory damages, including but not limited to those for past and future pecuniary and non-pecuniary losses, emotional distress, suffering, loss of reputation, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

I.    Punitive and/or liquidated damages for all claims allowed by law in an amount to be determined at trial;

J.    Pre-judgment and post-judgment interest at the highest lawful rate;

K.    A tax offset for any damages awarded;

L.    Attorneys' fees and costs; and

M.    Such further relief as justice demands.

Dated:  February 28, 2020.

Respectfully submitted,

s/ Jamie Hughes Hubbard
Jamie Hughes Hubbard
STIMSON STANCIL LaBRANCHE HUBBARD, LLC
Phone:  720.689.8909
Email:  hubbard@sslhlaw.com
Attorney for Plaintiff

### Certificate of Service

I certify that on February 28, 2020, I electronically filed the foregoing Amended Complaint with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

Daniel Spivey, dspivey@semplelaw.com
Jonathan Patrick Fero, jfero@semplelaw.com

*s/ Jamie Hubbard*
Jamie Hubbard