IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-03346-RBJ

Cl.G. on behalf of his minor son, C.G., the aggrieved party,

      Plaintiff,

v.

SCOTT SIEGFRIED, et al.

      Defendants.

---

## MOTION TO DISMISS

Defendants Scott Siegfried, Chris Smith, Ryan Silva, Kevin Uhlig, Brynn Thomas, Carla Stearns (the "Individual Defendants"), Cherry Creek School District No. 5 (the "District"), and the District's Board of Education (the "Board"), pursuant to Fed. R. Civ. P. 12(b)(6), move to dismiss Plaintiff C.G.'s Amended Complaint (Dkt. #30) in its entirety with prejudice.

<u>Certificate of Compliance</u>: Undersigned counsel certifies that he conferred extensively with C.G.'s counsel regarding the grounds for this Motion, and C.G. opposes dismissal.

## INTRODUCTION

C.G. challenges his suspension and expulsion from the District after he posted a very alarming statement on social media that he and his friends were going "to exterminate the Jews," which caused substantial disruption at Cherry Creek High School ("CCHS"). Specifically, C.G. asserts the following five claims under 42 U.S.C. § 1983: (1) all Defendants except the District violated his free speech rights by suspending and expelling him for the post; (2) the District and Board are liable for adopting unconstitutional policies, failure to train staff on free speech rights,

and a pattern of disciplining students for protected speech; (3) all Defendants violated his procedural due process rights when suspending and expelling him; (4) District policies are unconstitutionally overbroad and vague; and (5) all Defendants conspired to violate his civil rights. For the reasons discussed below, all these claims fail as a matter of law, the Individual Defendants are entitled to qualified immunity, and C.G.'s Complaint should be dismissed.

## C.G.'S ALLEGATIONS

C.G. is a student at CCHS. (Am. Compl. ¶¶ 14, 32.) On the evening of Friday, September 13, 2019, C.G. and three friends from CCHS went to a thrift shop. (*Id.* ¶¶ 34–35.) C.G. took a photograph of his three friends wearing hats, one of which resembled a foreign military hat from the World War II era. (*Id.* ¶¶ 35–36.) C.G. posted the photograph on the social media platform Snapchat with the caption, "**Me and the boys bout to exterminate the Jews**." (*Id.* ¶ 36 (emphasis added).) People who were "friends" with C.G. on Snapchat were able to view the post, and it spread within the local Jewish community. (*Id.* ¶¶ 4, 43.) One "friend" showed the post to her father, who called the police. (*Id.* ¶ 43.)

School officials also were contacted about the post. (*Id.* ¶ 6.) The Complaint excerpts an email chain between Mr. Silva, CCHS's Principal, and community members just over a day after the post on Sunday, September 15, 2019. (*Id.* ¶ 46.)[1] The chain started when a CCHS student's mother emailed Mr. Silva, Superintendent Siegfried, Chief of Staff Chris Smith, Rabbi Richard Rheins, Anti-Defamation League Regional Director Scott Levin, and others. (Ex. 1, pp. 3–4.) The student's mother stated C.G.'s social media post "ha[d] been **widely circulated** throughout the

---

[1] Exhibit 1 is the full email chain. Relevant documents referenced in a complaint are properly considered with a motion to dismiss. *GFF v. Assoc. Wholesale Grocers*, 130 F.3d 1381, 1384 (10th Cir. 1997).

Jewish community this weekend" and was "**generat[ing] fear, anger, and sadness** for [herself and husband] and most importantly [her son] … who has a class with at least one of the students" in the picture. (*Id.* at 3 (emphasis added).) The mother referenced prior anti-Semitic activity at CCHS and asked the District "to live your stated values of making the safety and security of our students a priority." (*Id.* at 4.) She noted her son "has expressed concern about returning to school and classes with students pictured in the anti-Semitic, hate speech Snapchat" and wants him to know that "teachers and administrators . . . are taking these threats seriously." (*Id.*)

The student's father then requested an explanation of the plan for when students returned to school the next day. (*Id.* at 2.) Mr. Silva replied that the plan was to "escort the students [involved in the post] from period 1 as they arrive." (*Id.* at 1.) Mr. Silva also explained that when "an incident happens off campus, we have to make sure there is a nexus to school. This is the case because our primary function is not to police the community. If we can make a case that there is a nexus to school, we can address a situation that happened away from school. **In this case, I feel the learning environment has been impacted**." (*Id.* (emphasis added).)

The next morning Monday, September 16, 2019, C.G. was escorted from his first period class and taken to Dean of Students Thomas's office and subsequently suspended for five days. (Am. Compl. ¶¶ 50–51.) Mr. Silva then sent a communication to CCHS students, parents, and staff addressing "an anti-Semitic social media post" that happened outside of school. (*Id.* ¶ 58; Ex. 2.)[2] Mr. Silva stated that CCHS was "investigating to determine the impact on the school environment and will take appropriate action" and that CCHS was "in communication with the Anti-Defamation

---

[2] Exhibit 2 is the message Mr. Silva sent to the CCHS community. Again, relevant documents referenced in a complaint are properly considered with a motion to dismiss. *GFF*, 130 F.3d at 1384.

League about how best to support students in the wake of this incident." (Ex. 2.) Mr. Silva further emphasized, "Cherry Creek High School does not tolerate hateful speech or actions. Our responsibility is to keep students safe and to provide a place where students of every race, ethnicity, religion, gender and sexual orientation feel safe, valued and supported." (*Id*.) Over the next few days, multiple news outlets ran stories covering C.G.'s post, and several more parents contacted the School. (Am. Compl. ¶¶ 59–60.)

On September 18, 2019, C.G.'s suspension was first extended for five days and then through the fall break holiday to enable an expulsion review process. (*Id*. ¶¶ 64, 66.) A few days later on September 23, 2019, CCHS dedicated a full advisory period schoolwide to discuss C.G.'s post and "encourage a real conversation between students and faculty about offensive and insensitive speech." (*Id*. ¶ 63.) Meanwhile, an expulsion hearing was held on October 7, 2019, and the hearing officer recommended C.G. be expelled. (*Id*. ¶¶ 70, 75.) Dr. Siegfried adopted the recommendation and expelled C.G. for one year, finding violations of Board Policies JKD-1-E (Grounds for Suspension, Expulsion, or Denial of Admission), JICDA (Conduct and Discipline Code), and ACC-R (Intimidation, Harassment, and Hazing).[3] (*Id*. ¶ 77.) C.G. appealed to the Board, which affirmed the expulsion. (*Id*. ¶ 78.)

## F.R.C.P. 12(b)(6) LEGAL STANDARD

A claim may be dismissed under Rule 12(b)(6) "either because it asserts a legal theory not cognizable as a matter of law or because the claim fails to allege sufficient facts to support a cognizable legal claim." *Essex Ins. Co. v. Tyler*, 309 F. Supp. 2d 1270, 1271 (D. Colo. 2004).

---

[3] These and other District policies are collected in Exhibit 3 and may be considered because they are referenced in the Complaint and subject to judicial notice. *GFF*, 130 F.3d at 1384; *Gardner v. Miami-Yoder Sch. Dist. JT-60*, 2010 WL 4537951, *1 (D. Colo. Nov. 3, 2010).

Well-pleaded factual allegations must be accepted as true and construed in the light most favorable to the plaintiff. *E.g.*, *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007). However, to survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[T]he plaintiff must do more than articulate a set of facts that could conceivably or possibly give rise to a claim; he must nudge his claim across the line from conceivable to plausible." *Havens v. Johnson*, 2012 WL 871195, at *3 (D. Colo. Mar. 13, 2012) (quotation omitted).

## ANALYSIS

**I.    C.G.'s First Amendment Claims Fail as a Matter of Law, and the Individual Defendants are Entitled to Qualified Immunity.**

C.G.'s first and second claims for relief are that the District, the Board, and the Individual Defendants violated his First Amendment rights by suspending and expelling him for off-campus speech. (Am. Compl. ¶¶ 79–94.) In his second claim, C.G. alternatively argues District policies JKD-1-E, JICDA, and ACC-R are facially overbroad. (*Id.* ¶¶ 99–102.)

**A.    Disciplining C.G. did not infringe the right to free speech because his post foreseeably caused a substantial disruption at CCHS.**

While the U.S. Supreme Court and Tenth Circuit have not addressed the standard applied when a public school district disciplines a student for speech that the student made off-campus and not during school activities, other jurisdictions apply the standard articulated in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969). Under *Tinker*, "a public school may not restrict private student expression unless the school reasonably forecasts it 'would materially and substantially interfere with the requirements of appropriate discipline in operation

5

of the school,' or 'impinge upon the rights of other students.'" *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 36 (10th Cir. 2013).

Indeed, most circuits that have considered the issue have applied *Tinker* to students' off-campus speech. *See Bell v. Itawamba Cty. Sch. Bd.*, 799 F.3d 379, 393 (5th Cir. 2015) ("[O]f the six circuits to have addressed whether [a school can regulate] . . . off-campus speech, five, including our own, have held [they can]. (For the other of the six circuits (the third circuit), there is an intra-circuit split)."). The reasoning reflects reality: "[t]he pervasive and omnipresent nature of the Internet has obfuscated the on-campus/off-campus distinction . . . mak[ing] any effort to trace First Amendment boundaries along the physical boundaries of a school campus a recipe for serious problems in our public schools." *Id.* at 396–97 (quotation omitted); *see also Doninger v. Niehoff*, 527 F.3d 41, 49 (2d Cir. 2008) (agreeing that in era of "blog postings, instant messaging, and other forms of electronic communication" "territoriality is not necessarily a useful concept in determining the limit of [school administrators'] authority") (quotation omitted).

Consequently, there is a growing recognition by federal courts that "a student may be disciplined for expressive conduct, even conduct occurring off school grounds, when this conduct would foreseeably create a risk of substantial disruption within the school environment, at least when it was similarly foreseeable that the off-campus expression might also reach campus." *Id.* at 48 (quotation omitted); *see also McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700, 707 (9th Cir. 2019) ("[C]ourts considering whether a school district may constitutionally regulate off-campus speech must determine, based on the totality of the circumstances, whether the speech bears a sufficient nexus to the school"); *Kowalski v. Berkeley Cty. Schs.*, 652 F.3d 565, 573 (4th Cir. 2011) (applying similar "nexus" standard to uphold discipline for social media activity).

While C.G.'s post was made off campus, it certainly was foreseeable it would rapidly reach the CCHS community. Moreover, it was reasonably foreseeable that the incredibly inflammatory content of the post—that C.G. and his friends were going to "exterminate the Jews"—would cause a substantial disruption to the School's operation. As alleged in the Complaint, Snapchat is viewable by any CCHS student who was "friends" with C.G., and before the weekend was over, Principal Silva was responding to multiple emails expressing serious concern about what would happen when school resumed. (Am. Compl. ¶¶ 4, 6, 43, 46; Ex. 1.) Already recognizing an "impact" on "the learning environment," Silva responded swiftly, issuing a statement about the post to the entire CCSD community after C.G. had been suspended. (Am. Compl. ¶ 58; Ex. 2.) Over the next few days, news media reported the post, and more parents contacted the School. (Am. Compl. ¶¶ 59–60.) Even more than a week after C.G. made the post, it was still such an issue in the School that a full advisory period was dedicated to discussing offensive and insensitive speech. (*Id.* ¶ 63.) These allegations demonstrate on the face of the Complaint that C.G.'s post both reached the CCHS community and not only could have but did cause a substantial disruption at the School. *Cf. Kowalski*, 652 F.3d at 572–73 (holding *Tinker* standard met where student's personal website functioned as a platform to direct verbal attacks towards a classmate). As a result, disciplining C.G. did not violate the First Amendment.

### B.     With no clearly established law barring the regulation of off-campus speech, the Individual Defendants are entitled to qualified immunity.

Qualified immunity shields government officials from liability for civil damages if their actions did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Once raised, a "heavy two-part burden" shifts to a plaintiff. *E.g., Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir. 1996).

"In order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011) (quotation omitted). "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" *Lobozzo v. Colo. Dep't of Corrs.*, 429 F. App'x 707, 710 (10th Cir. 2011).

As noted above, there is no Supreme Court or Tenth Circuit decision on point, or any clearly established weight of authority from other courts, that would have put the Individual Defendants on notice that disciplining C.G. for his post would violate the First Amendment. *Cf. Yeasin v. Durham*, 719 F. App'x 844, 852 (10th Cir. 2018) (granting university official qualified immunity because "[a]t the intersection of university speech and social media, First Amendment doctrine is unsettled," and plaintiff cannot "establish [the official] violated clearly established law when she expelled him, in part, for his online, off-campus tweets"); *accord M.L. v. San Benito Indep. Consol. Sch. Dist.*, 942 F.3d 258 (5th Cir. 2019). Thus, the Individual Defendants are entitled to qualified immunity.[4]

## C.     District disciplinary policies are not facially overbroad.

In his second claim, C.G. asserts that District policies (including JKD-1-E, JICDA, and ACC-R) violate the First Amendment by allowing students to be suspended or expelled for off-

---

[4] Alternatively, Carla Stearns, the District's Executive Director of High School Education, and Chief of Staff Mr. Smith, are entitled to qualified immunity because there are no plausible allegations that they personally participated in disciplining C.G. (*Cf.* Am. Compl. ¶¶ 54, 66, 68-69.) *See, e.g.*, *Dodds v. Richardson*, 614 F.3d 1185, 1194 (10th Cir. 2010) (emphasizing that in qualified immunity analysis, "courts must consider as well whether each defendant's alleged conduct violated the plaintiff's clearly established rights"). The only specific alleged acts of Ms. Stearns are that she would not meet with C.G. or his family during the expulsion review and refused to explain why. (Am. Compl. ¶ 69.) The only specific alleged act of Mr. Smith was that he notified C.G. that his suspension was being extended. (*Id.* ¶ 66.)

campus speech, unconnected to a school-sponsored event or activity. (*Id.* ¶¶ 99–102.) Such a claim is extremely disfavored, and "[a] court should address an overbreadth challenge to a law only when the law may have a chilling effect on the free speech rights of parties not before the court." *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1367 (10th Cir. 2000) (citation omitted).

Here, District policies have limiting language, and there is no realistic danger that they will compromise established First Amendment rights of other students. *See West*, 206 F.3d at 1367 (citing cases). Policy JICDA states that District conduct and discipline rules "shall not infringe upon constitutionally protected rights." (Ex. 3, p. 3.) While Policy JKD-1-E allows suspensions or expulsions for "[b]ehavior on or off school property," the behavior must be "detrimental to the welfare or safety of other pupils or of school personnel." (*Id.* at 1.) Policy JICED, which C.G. does not acknowledge in the Complaint, more specifically recognizes "student expression rights." (*Id.* at 20.) Discipline is limited to expression that "[c]reates a clear and present danger of . . . the material and substantial disruption of the orderly operation of the school." (*Id.*) This falls within the *Tinker* standard, and as detailed above, the weight of authority recognizes the authority of schools to discipline students for off-campus speech when a substantial disruption is reasonably foreseeable. C.G.'s facial challenge, therefore, must fail.

## II.      C.G.'s Procedural Due Process Claims Fail as a Matter of Law.

C.G.'s third claim alleges he was disciplined without due process. (Am. Compl. ¶¶ 113–22.) C.G.'s fourth claim alleges District policies are vague and overbroad. (*Id.* ¶¶ 133–37.)

### A.      C.G.'s allegations establish he was provided ample due process.

C.G. appears to attack the process surrounding each step of his suspensions and expulsion, but it is wrong to segregate his discipline into such phases when evaluating what process was due.

All the discipline C.G. received was tied to his Snapchat post, and the suspensions were subsumed by the ultimate expulsion. As C.G. alleges, the extended suspension beyond five days was to facilitate an expulsion review process. (*Id.* ¶ 64.) Also, C.G. does not allege harm specific to the suspensions, and it follows that any harm must have resulted from the expulsion. Further undercutting any notion that even the initial five-day suspension should be viewed separately, is C.G.'s allegation that his expulsion was decided the same day he was sent home. (*Id.* ¶ 54.)[5]

The issue, therefore, is the ultimate procedure attendant to the expulsion, but again, C.G.'s allegations establish the District afforded him all the process that could have been due. An expulsion hearing was held where evidence was presented, and a hearing officer made findings. (*Id.* ¶¶ 70–75.) That certainly satisfied *Goss's* suggestion of "more formal procedures" for suspensions over 10 days or expulsions. *See Watson v. Beckel*, 242 F.3d 1237, 1240–41 (10th Cir. 2001). Indeed, the only procedural defect C.G. alleges regarding the expulsion was that Dr. Siegfried did not adopt the hearing officer's recommendation of expulsion until 14 days after the hearing when Colorado statute requires the decision to be made within five days of an expulsion hearing. (Am. Compl. ¶¶ 76–77.) However, the Constitution does not require an expulsion decision be made within a certain period of time, and the alleged failure to strictly follow state statute (or District policy) does not constitute a due process violation. *See, e.g., Jones v. City & Cty. of Denver,* 854 F.2d 1206, 1209 (10th Cir. 1988).

---

[5] Assuming *arguendo* the first suspension is properly assessed in isolation, C.G.'s allegations establish he was afforded due process. For such a short suspension, a student merely must be "given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Neal v. Colo. State Univ.-Pueblo*, 2017 WL 633045, at *18–19 (D. Colo. Feb. 16, 2017) (quoting *Goss v. Lopez*, 419 U.S. 565, 581 (1975)). Before being sent home, C.G. was notified of the District's concerns about his post, and by his own allegation, he had "hours" in Dean of Students Brynn Thomas's office to be heard. (Am. Compl. ¶¶ 50–51.) C.G. complains he had no opportunity to appeal the initial five-day suspension, but that was not required by the Constitution.

**B.**   **With no clearly established law specifying more process for expulsion, the Individual Defendants are entitled to qualified immunity.**

As discussed above, government officials are entitled to qualified immunity if their actions did not violate clearly established constitutional rights. *E.g.*, *Brown*, 662 F.3d at 1164. As recognized in *Watson*, 242 F.3d at 1240–41, and *Neal*, 2017 WL 633045, at *18–19, the Tenth Circuit and the U.S. Supreme Court have not ruled definitively on the procedures required for an expulsion for ten days or more. Consequently, there is no clearly established law that would have put the Individual Defendants on notice that any additional procedures should have been provided to C.G. It also is entirely unclear from the Complaint how any of the Individual Defendants may have personally participated in any acts regarding the process afforded to C.G., particularly given the Board's final adoption of the expulsion. (*Cf.* Am. Compl. ¶¶ 51, 54, 58, 64–67, 69.) *See, e.g.*, *Dodds*, 614 F.3d at 1194. The Individual Defendants, therefore, are entitled to qualified immunity.

**C.**   **Superintendent Siegfried is entitled to absolute immunity.**

For the procedural due process claim, the only allegation made regarding Dr. Siegfried's participation in the expulsion process was that he reviewed the hearing officer's findings and recommendation and affirmed the expulsion. (Am. Compl. ¶¶ 76–77.) "The Supreme Court has long recognized that officials in administrative hearings can claim the absolute immunity that flows to judicial officers if they are acting in a quasi-judicial fashion . . . . For an official at an administrative hearing to be protected by absolute immunity (a) the officials functions must be similar to those involved in the judicial process, (b) the officials' actions must be likely to result in damages lawsuits by disappointed parties, and (c) there must exist sufficient safeguards in the regulatory framework to control unconstitutional conduct." *Guttman v. Khalsa*, 446 F.3d 1027, 1033 (10th Cir. 2006) (quotation omitted). Dr. Siegfried's role in reviewing the hearing officer's

findings and recommendation and affirming the expulsion meets these requirements. *Cf. Starr v. City of Lakewood*, 2009 WL 1120038, *4 (D. Colo. Apr. 27, 2009) (holding city manager who reviewed and affirmed hearing officer's findings and decision was entitled to absolute immunity).

### D.    C.G's facial challenge to District policies fails as a matter of law.

C.G.'s remaining facial challenge does not specify any policy which is alleged to be unconstitutionally vague or overbroad. Assuming C.G. is referring to the three policies referenced elsewhere in the Complaint (JDK-1-E, JICDA, and ACC-R), his claim fails as a matter of law.

As discussed above, courts heavily scrutinize facial challenges. To establish that school policies are unconstitutionally overbroad, C.G. must show that "no set of circumstances exists under which" the challenged policies "would be valid." *West*, 206 F.3d at 1367. To establish that policies are unconstitutionally vague, C.G. must show a "reasonable student of ordinary intelligence who read the policy could not understand what conduct it prohibited." *Id*. at 1368. C.G. has not and cannot meet these standards.

First, it is unclear how the policies could possibly be overbroad, given that they are validly applied on a regular basis to all sorts of student conduct. Second, without reference to any policy language, C.G. claims District policies are unconstitutionally vague because they do not give adequate notice of what conduct may result in discipline. (Am. Compl. ¶ 133.) Yet, the policies plainly specify what conduct is prohibited. (*See* Ex. 3 at 1) (describing 13 categories of conduct that may be grounds for discipline). Further, "[g]iven the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process . . . school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." *West*, 206 F.3d at 1368; *see also Wiemerslage v. Maine Twp. High Sch. Dist.*

*207*, 29 F.3d 1149, 1151 (7th Cir. 1994) (emphasizing that for school discipline rules, "flexibility or breadth should not necessarily be confused for vagueness").

C.G. appears to challenge on vagueness grounds language in Policies JKD-1-E and JICDA which permits discipline for behavior "which is detrimental to the welfare or safety of other pupils or of school personnel" or is "detrimental to the welfare, safety, or morals of other students or school personnel." (Am. Compl. ¶¶ 24–25, 133.) This language comes directly from § 22-33-106(1)(c), C.R.S. In *People in Interest of K.P.*, 514 P.2d 1131, 1133 (Colo. 1973), the Colorado Supreme Court rejected a vagueness challenge to that statutory language, concluding "the legislature has provided factors in sufficiently clear and definite language to apprise students of the type of conduct which is prohibited." *Accord Clements v. Bd. of Trustees of Sheridan Cty. Sch. Dist. No. 2*, 585 P.2d 197, 203–04 (Wyo. 1978) (citing *K.P.* and concurring with its reasoning as applied to substantially similar Wyoming statute).

### III.     C.G.'s Allegations Do Not Support a § 1983 Conspiracy Claim.

C.G. asserts that all the Defendants conspired to violate his civil rights under § 1983. (Am. Compl. ¶¶ 141–50.) For this claim, C.G. must establish: "(1) a shared conspiratorial objective (the agreement to deprive the Plaintiff of a constitutional or statutory right); (2) concerted action by the Defendants; and (3) an actual deprivation of rights." *Afola v. Corr. Corp. of Am.*, 2013 WL 2477126, *4 (D. Colo. June 10, 2013) (citing *Snell v. Tunnell*, 920 F.2d 673, 702 (10th Cir. 1990)). "Conclusory allegations of conspiracy are insufficient . . . ." *Id*. (citing *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1994)). Indeed, "[t]o state a cause of action for conspiracy under § 1983, a plaintiff must allege specific facts showing agreement and concerted action among defendants." *Id*. C.G. does not do so. He points to eleven acts that allegedly evidence "affirmative

steps to create a disruption to the school environment in an effort to justify C.G.'s suspension and expulsion." (Am. Compl. ¶ 143(a)–(k).) However, none of these acts are connected to any Individual Defendant, and no allegations are made regarding any agreement or concerted action. Conspiracy cannot be plausibly inferred from these conclusory allegations.

Finally, the Individual Defendants are entitled to qualified immunity on all the conspiracy claims because, as already discussed, the weight of authority permits schools to regulate off-campus speech, and there certainly is no clearly established law in the Tenth Circuit prohibiting discipline when substantial disruption is forecast and then results. *See, e.g.*, *Brown*, 662 F.3d at 1164. Accordingly, nothing put the Individual Defendants on notice that allegedly cooperating in disciplining C.G. for his post would constitute a conspiracy to violate his rights. Additionally, it is unclear from the Complaint how any of the Individual Defendants may have personally participated in any alleged conspiracy. (*Cf.* Am. Compl. ¶¶ 51, 54, 58, 64–67, 69.) *See, e.g.*, *Dodds*, 614 F.3d at 1194.

### IV.      Naming Both the District and the Board is Redundant.

C.G. names both the District and the Board as defendants, but this is redundant. In Colorado, a school district is the entity subject to suit and encompasses its governing board. Colo. Const. art. IX, § 15 ("The general assembly shall, by law, provide for organization of school districts of convenient size, in each of which shall be established a board of education . . . ."); § 22-32-101, C.R.S. (declaring each school district is a body corporate and in its name it may "sue and be sued"). Consequently, the Board should be dismissed. *K.D. v. Harrison Sch. Dist. 2*, 2018 WL 4467300, at *6 (D. Colo. Sept. 18, 2018) (dismissing school board where both it and district had been named) (citing, *inter alia*, *Roe v. Karval Sch. Dist. RE23*, 2013 WL 1858464, at *7 (D.

14

Colo. May 2, 2013) (holding proposed amendment naming both board and district as defendants was "inappropriate" because they "are not separate entities")).

## CONCLUSION

The District properly disciplined C.G. for his highly alarming and substantially disruptive social media post that he was going "to exterminate the Jews." Defendants respectfully request that the Court issue an order dismissing Plaintiff C.G.'s Amended Complaint in its entirety with prejudice under Rule 12(b)(6) for failure to state any claim upon which relief can be granted.

RESPECTFULLY SUBMITTED this 13th day of March, 2020.

SEMPLE, FARRINGTON, EVERALL & CASE, P.C.

By: _s/Jonathan P. Fero_
   M. Brent Case
   Jonathan P. Fero
   Daniel P. Spivey
   1120 Lincoln Street, Suite 1308
   Denver, CO  80203
   (303) 595-0941
   bcase@semplelaw.com
   jfero@semplelaw.com
   dspivey@semplelaw.com
   *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of March, 2020, a correct copy of the foregoing **MOTION TO DISMISS** was filed and served via CM/ECF to the following:

Jamie Hubbard
Stimson Stancil LaBranche Hubbard, LLC
1652 N. Downing Street
Denver, CO 80218
hubbard@sslhlaw.com
*Attorney for Plaintiff*

By: _s/ Kathleen Schmidt_

15