IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 19-cv-03346-RBJ

C1.G., on behalf of his minor son, C.G., the aggrieved party

      Plaintiff,

v.

SCOTT SIEGFRIED, Superintendent of Cherry Creek School District,
CHRIS SMITH, Chief of Staff for the Educational Services Center of Cherry Creek School District,
RYAN SILVA, Principal of Cherry Creek High School,
KEVIN UHLIG, Assistant Principal at Cherry Creek High School,
BRYNN THOMAS, Dean at Cherry Creek High School, and
CHERRY CREEK SCHOOL DISTRICT NO. 5.,

      Defendants.

---

## ORDER ON DEFENDANTS' MOTION TO DISMISS

---

This matter is before the Court on defendants Scott Siegfried, Chris Smith, Ryan Silva, Kevin Uhlig, Brynn Thomas, Carla Stearns, Cherry Creek School District No. 5 (the "District"), and the District's Board of Education (the "Board")'s motion to dismiss, ECF No. 32, plaintiff C.G.'s amended complaint, ECF No. 30, in its entirety.  For the reasons stated herein, the motion is GRANTED.

## I. BACKGROUND

C.G. is a minor student who attended Cherry Creek High School ("CCHS") until he was officially expelled on October 21, 2019.  ECF No. 30 ¶¶ 32, 77.  On the evening of Friday, September 13, 2019 C.G. and three friends from CCHS went to a thrift shop.  *Id.* ¶¶ 34–35.  C.G. took a picture of his three friends wearing hats and wigs, including one hat that resembled a

1

foreign military hat from the World War II period.  *Id.* ¶ 35.  C.G. posted the picture to the social media platform Snapchat with the caption: "Me and the boys bout to exterminate the Jews."  *Id.* ¶ 36.  The caption referenced an internet meme and was intended to be humorous.  *Id.* ¶ 36–37. C.G. posted the picture to his Snapchat story, meaning any "friend" of C.G.'s on Snapchat could view the post.  *Id.* ¶¶ 38, 43.  C.G. did not tag anyone or send the picture directly to anyone.  *Id.* ¶¶ 40–41.

Pictures posted to Snapchat stories expire after twenty-four hours and are then automatically deleted.  *Id.* ¶ 39.  However, C.G. removed the picture within a few hours of posting.  *Id.*  That same evening he also posted an apology to his Snapchat story that stated: "I'm sorry for that picture it was ment [sic] to be a joke."  *Id.* ¶ 45.

One of C.G.'s "friends" on Snapchat viewed the picture before C.G. deleted it and took a screenshot.  *Id.* ¶ 43.  She showed it to her father, who called the police and spread it to "others in the Jewish community."  *Id.* ¶¶ 4, 43.  Police officers responded to C.G.'s house and determined there was no threat against anyone.  *Id.* ¶ 44.

School officials were also contacted about the picture.  *Id.* ¶ 6.  On Sunday, September 15, 2019 a CCHS student's mother emailed CCHS Principal Ryan Silva, District Chief of Staff Chris Smith, Rabbi Richard Rheins, Anti-Defamation League Regional Director Scott Levin, and others.  ECF No. 32-1 at 3.  The student's mother stated that the picture "ha[d] been widely circulated throughout the Jewish community th[at] weekend" and "generate[d] fear, anger, and sadness for [herself and her husband], and most importantly [her son] who ha[d] a class with at least one of the students identified in the picture."  *Id.*  The mother also referenced prior anti-Semitic activity at CCHS and asked the school to use this incident to address the rise in hate speech and hate crimes in the Cherry Creek community.  *Id.* at 3–4; ECF No. 30 ¶ 56.

In response, Principal Silva noted that the administration's plan was to "escort the students involved from period 1 as they arrive" on the following Monday morning.  ECF No. 32-1 at 1.  He also explained:

> When an incident happens off campus, we have to make sure there is a nexus to school.  This is the case because our primary function is not to police the community.  If we can make a case that there is a nexus to school, we can address a situation that happened away from school.  In this case, I feel the learning environment has been impacted.

*Id.*

Early that Monday morning on September 16, 2019, CCHS School Resource Officer sent Assistant Principal Kevin Uhlig a copy of the picture and the subsequent apology.  ECF No. 30 ¶ 48.  Assistant Principal Uhlig forwarded the email, with attachments, to other school officials.  *Id.*

Later on Monday morning, school security met C.G. at his first period class and escorted him to Dean of Students Brynn Thomas's office.  *Id.* ¶¶ 49–50.  Dean Thomas notified C.G. that he was suspended for five days through September 20, 2019 while CCHS investigated how his off-campus speech impacted the school environment.  *Id.* ¶ 51.  The suspension was premised on a violation of District policy JICDA-13, which prohibits verbal abuse by a student "while in school buildings, on school grounds, in school vehicles, or during a school-sponsored activity."  *Id.* ¶ 52; ECF No. 32-3 at 3.  C.G. asserts that he was not given the opportunity to appeal this suspension decision.  ECF No. 30 ¶ 53.

At 10:30 a.m. that same day, Assistant Principal Uhlig emailed District Executive Director of High School Education Carla Stearns stating his desire to "go for an expulsion review on [C.G.]."  *Id.* ¶ 54.

That afternoon, Principal Silva sent an email to the CCHS community, including students, parents, and staff, about the "anti-Semitic social media post over the weekend." *Id.* ¶ 58. Principal Silva explained that the school "was investigating to determine the impact on the school environment and will take appropriate action." *Id.* He emphasized that CCHS "does not tolerate hateful speech or actions," and that CCHS's "responsibility is to keep students safe and to provide a place where students of every race, ethnicity, religion, gender and sexual orientation feel safe, valued and supported." *Id.*; ECF No. 32-2. Over the next few days, multiple news outlets ran stories covering the Snapchat post and three additional parents contacted CCHS about it. ECF No. 30 ¶¶ 59–60.

Meanwhile, CCHS used an advisory period on Monday, September 23, 2019 to discuss C.G.'s post and encourage conversation between students and faculty about offensive and insensitive speech. *Id.* ¶ 63. CCHS holds an advisory period twice a week for thirty minutes. *Id.* ¶ 62. The advisory periods are intended to manage the administrative and counseling tasks that have historically interrupted educational time. *Id.*

On September 18, 2019 Dean Thomas informed C.G.'s mother that C.G.'s suspension was being extended for five additional days through September 27, 2019 to facilitate an expulsion review process. *Id.* ¶ 64. Assistant Principal Uhlig sent a follow-up letter confirming this decision. *Id.* Neither Dean Thomas nor Assistant Principal Uhlig cited a specific policy to support the extension, so C.G. alleges that it was again based on District policy JICDA(13). *Id.* C.G. asserts that he was not given the opportunity to appeal this suspension extension decision. *Id.* ¶ 65. Specifically, C.G. argues that in violation of District policy JKD-1-R, his parents were not given notice of a time and place they could meet with Dean Thomas or Assistant Principal Uhlig to review the suspension. *Id.*

Later that same day, Chief of Staff Smith notified C.G. that his suspension was being extended an additional eleven school days through October 21, 2019 (which spanned CCHS's scheduled fall break) to allow for completion of the expulsion process. *Id.* ¶ 66. C.G. again asserts that his parents were not notified of a time and place they could meet with school officials to review the suspension. *Id.*

C.G. and his parents attempted to engage defendants and other CCHS and District officials about the incident. *Id.* ¶ 67. On September 23, 2019, C.G.'s parents sent a packet to Superintendent Siegfried, Chief of Staff Smith, District Director Sterns, Principal Silva, Assistant Principal Uhlig, Dean Thomas, and other District officials that included: a letter from C.G. accepting full responsibility for the Snapchat picture, apologizing for his behavior, explaining that it was an impulsive lapse of judgment not intended to hurt anyone, and stating that he had recently spent time educating himself about Jewish history and talking with Jewish community members and advocacy groups; a letter from C.G.'s parents reiterating C.G.'s journey of education and reticence; and letters from community members who know C.G. and his family requesting that CCHS turn this into "a learning opportunity." *Id.* ¶ 68. On September 24, 2019 C.G.'s mother followed up on this information and requested a meeting with District officials. *Id.* ¶ 69. District Director Stearns explained there would be no meeting and noted that C.G. was set for an expulsion hearing. *Id.*

The District held the expulsion hearing on October 7, 2019. *Id.* ¶ 70. At the hearing C.G. asserted that his speech was protected by the First Amendment. *Id.* ¶ 73. Assistant Principal Uhlig testified that CCHS was entitled to regulate off-campus speech if it had a "nexus" with the school environment, although he acknowledged that the word "nexus" does not appear in any District policy. *Id.* He testified that at the time he made the decision to pursue

expulsion against C.G., he was unaware that C.G. had posted an apology to his Snapchat feed. *Id.* ¶ 71.  C.G. alleges that Assistant Principal Uhlig concealed the fact that he had received a screenshot of C.G.'s apology post via email four hours before he "decided to recommend expulsion," presumably referring to the email in which Assistant Principal Uhlig recommended "go[ing] for an expulsion review."  *Id.* ¶¶ 54, 71.

Assistant Principal Uhlig also testified that the post caused "extreme outcry of concerned community members and students . . . over fear to come to school" and "fear to access education."  *Id.* ¶ 72.  He did not reference specific support for this comment.  C.G. alleges that in fact "[n]o student expressed fear about coming to school . . . and no student was afraid to access education."  *Id.*

The hearing officer found that C.G. was not on campus or at a school-sanctioned activity when he posted the picture; C.G. did not use a device or website related to CCHS or the District to post the picture; C.G. did not tag CCHS or the District or any employee thereof in his post; no evidence indicated that C.G.'s actions were directed towards CCHS, any CCHS activity, or the District community; and C.G. did not make a specific threat to any individual in his post.  *Id.* ¶ 73.  She also found that she could not determine issues of law, including whether C.G.'s speech was protected by the First Amendment.  *Id.*

The hearing officer further found that C.G. had not violated District policy JICDA(13), the provision relied upon by Dean Thomas relied for C.G.'s initial suspension and by Assistant Principal Uhlig for the first extension of C.G.'s suspension.  *Id.* ¶ 74.  Specifically, the hearing officer found that District policy JICDA(13) applied only to behaviors engaged in while students are in school buildings, on school grounds, in school vehicles, or during a school-sponsored activity.  *Id.*  C.G.'s conduct occurred off-campus and was not associated with any CCHS

vehicle, activity, or event.  *Id*.  However, the hearing officer found that C.G. violated other

District policies and recommended expulsion.  *Id.* ¶ 75.

Colorado law and District policy require the Superintendent to review the hearing

officer's factual findings and recommendation and to issue a written decision within five days of

the expulsion hearing.  *Id.* ¶ 76.  On October 21, 2019, fourteen days after the expulsion hearing,

Superintendent Siegfried notified C.G. that he was expelled from CCHS for one year.  *Id.* ¶ 77.

Superintendent Siegfried found that C.G.'s actions violated the following District policies: (1)

JICDA(13) prohibiting verbal abuse in a school building or on school property (overruling the

hearing officer's finding that JICDA(13) did not apply); (2) JICDA(19) regulating "behavior on

or off school property which is detrimental to the welfare, safety or morals of other students or

school personnel"; (3) ACC-R prohibiting intimidation, harassment, or hazing by directing an

obscene comment or gesture at another person or insulting or challenging another person or by

threatening another person; and (4) JKD-1-E, which allows for suspension, expulsion or denial

of admission for behavior on or off school property that is detrimental to the welfare or safety of

other pupils or of school personnel including behavior that creates a threat of physical harm.  *Id*.

C.G. appealed Superintendent Siegfried's decision to the Board.  The Board held a

hearing on December 2, 2019 with all Board members present.  *Id.* ¶ 78.  The same day, the

Board voted to affirm Superintendent Siegfried's decision.  *Id*.  The Board did not provide any

written findings to C.G.  *Id*.

Procedural Background

On November 26, 2019 C1.G. filed a complaint on behalf of his minor son C.G. in this

Court against the District, Superintendent Siegfried, Principal Silva, Chief of Staff Smith, Dean

Thomas, and Assistant Principal Uhlig.  ECF No. 1.  On March 2, 2020 C1.G filed an amended

complaint adding as defendants Director Stearns and the Board.  ECF No. 30.

The complaint alleges five causes of action under 42 U.S.C. § 1983.  First, C.G. alleges a violation of the First and Fourteenth Amendments against Superintendent Siegfried, Principal Silva, Chief of Staff Smith, Dean Thomas, and Assistant Principal Uhlig, Director Stearns, and the Board for suspending and expelling C.G.  *Id.* ¶¶ 79–94.  Second, C.G. alleges a violation of the First and Fourteenth Amendments against the District and the Board for adopting unconstitutional policies, failing to train staff on free speech rights, and a pattern of disciplining students for protected speech.  *Id.* ¶¶ 95–109.  Third, C.G. alleges a violation of Fourteenth Amendment procedural due process rights against all defendants for suspending and expelling him.  *Id.* ¶¶ 110–29.  Fourth, C.G. alleges a violation of Fourteenth Amendment procedural due process rights against the District and the Board for adopting overbroad and vague policies.  *Id.* ¶¶ 130–40.  Fifth, C.G. alleges a violation of the First and Fourteenth Amendments against all defendants for conspiracy to violate C.G.'s constitutional rights.  *Id.* ¶¶ 141–50.

On March 13, 2020 defendants filed a motion seeking to dismiss all claims.  ECF No. 32. Defendants argue that all of C.G.'s claims fail as a matter of law; defendants are all entitled to qualified immunity; Superintendent Siegfried is entitled to absolute immunity; and naming both the District and the Board as defendants is redundant.  *Id*.  C.G. voluntarily dismisses the Board as a redundant party.  ECF No. 36 at 16 n.5.

## II.  STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A plausible claim is one that "allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While courts must accept well-pled allegations as true, purely conclusory statements are not entitled to this presumption. *See id.* at 678, 681. Therefore, so long as the plaintiff pleads sufficient factual allegations such that the right to relief crosses "the line from conceivable to plausible," she has met the threshold pleading standard. *Twombly*, 550 U.S. at 556, 570.

### III.  ANALYSIS

#### A.  <u>First Claim: First Amendment Free Speech Challenge</u>

The parties dispute whether to apply the standard articulated in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969); if *Tinker* does apply, whether its contours are different when applied to off-campus speech; and regardless, whether C.G.'s conduct is protected. I address each question in turn.

##### 1.  <u>Whether *Tinker* Applies to Off-Campus Speech</u>

The parties dispute what standard to apply when a public-school district disciplines a student for speech made off-campus and not during school activities. Neither the Supreme Court nor the Tenth Circuit have directly addressed this issue. *See Hunt v. Bd. of Regents of Univ. of New Mexico*, 792 F. App'x 595, 606 (10th Cir. 2019). However, several federal Courts of Appeals have applied the standard articulated in *Tinker*, 393 U.S. 503, to off-campus speech. Under *Tinker*, "a public school may not restrict private student expression unless the school reasonably forecasts it 'would materially and substantially interfere with the requirements of appropriate discipline in operation of the school,' or 'impinge upon the rights of other students.'" *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 36 (10th Cir. 2013) (citing *Tinker*, 393 U.S. at 513).

In the absence of definitive Tenth Circuit law, defendants urge me to follow these Courts of Appeals and extend *Tinker* to off-campus speech.  ECF No. 32 at 5–6.  C.G. rejects such an extension, arguing instead that off-campus speech is fully protected by the First Amendment. ECF No. 36 at 5–6.

I acknowledge the Supreme Court's long-standing distinction between on-campus or school-sponsored speech—which generally can be regulated by school authorities—and off-campus or non-school-sponsored speech—which generally is protected by the First Amendment. *See, e.g.*, *Morse v. Frederick*, 551 U.S. 393, 405 (2007) (noting that, when affirming a student's suspension for unveiling a "Bong hits 4 Jesus" banner at a school-sponsored rally, the "same speech in a public forum outside the school context . . . would have been protected").  The Tenth Circuit has expressly upheld the Supreme Court's "recogni[tion] that the First Amendment rights of students in public schools are not automatically coextensive with the rights of adults in other settings, and must be applied in light of the special characteristics of the school environment." *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1366 (10th Cir. 2000) (quoting *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 266 (1988)).

However, the Tenth Circuit has recently recognized "that five out 'of the six circuits to have addressed whether *Tinker* applies to off-campus speech . . . have held it does.'" *Hunt*, 792 F. App'x at 605 (quoting *Bell v. Itawamba Cty. Sch. Bd.*, 799 F.3d 379, 393 (5th Cir. 2015)) (applying qualified immunity where, given the circuit split, clearly established law does not mandate applying *Tinker* to off-campus speech).  The Second, Fourth, Fifth, Eighth, and Ninth Circuits have all applied *Tinker* to off-campus speech.  *See Doninger v. Niehoff*, 527 F.3d 41, 48 (2d Cir. 2008); *Kowalski v. Berkeley Cty. Schs.*, 652 F.3d 565, 573 (4th Cir. 2011); *D.J.M. ex rel. D.M. v. Hannibal Pub. Sch. Dist. No. 60,* 647 F.3d 754, 766–67 (8th Cir. 2011); *Wynar v.*

*Douglas Cty. Sch. Dist.*, 728 F.3d 1062, 1068–69 (9th Cir. 2013).  There is an intra-circuit split within the Third Circuit.  *See Layshock v. Hermitage Sch. Dist.,* 650 F.3d 205, 219–20 (3d Cir. 2011) (en banc) (Jordan, J., concurring) (discussing that *Tinker* 's applicability to off-campus speech remains unresolved in the Third Circuit).  The First, Sixth, Seventh, Tenth, Eleventh, and D.C. Circuits have yet to directly address the issue.  *See Bell*, 799 F.3d at 393–94.

I adopt the majority view that *Tinker* applies to off-campus speech.  I agree with the Fifth Circuit that "[t]he pervasive and omnipresent nature of the Internet has obfuscated the on-campus/off-campus distinction . . . mak[ing] any effort to trace First Amendment boundaries along the physical boundaries of a school campus a recipe for serious problems in our public schools."  *Id.* at 396–97.  Even as far back as 2008, the Second Circuit also recognized that "territoriality is not necessarily a useful concept in determining the limit of [school administrators'] authority" in this era where "students both on and off campus routinely participate in school affairs, as well as in other expressive activity unrelated to the school community, via blog postings, instant messaging, and other forms of electronic communication."  *Doninger*, 527 F.3d at 48–49 (alteration in original).  The modern reality of social media is that off-campus electronic speech regularly finds its way into schools and can disrupt the learning environment.  Failing to adapt to this reality would be inconsistent with the Supreme Court's recognition that "the First Amendment rights of students in public schools are not automatically coextensive with the rights of adults in other settings, and must be applied in light of the special characteristics of the school environment."  *West*, 206 F.3d at 1366 (quoting *Kuhlmeier,* 484 U.S. at 266).  Applying *Tinker* to off-campus speech properly protects both students' constitutional rights and the evolving nature of "the school environment."  Social media has become part of that environment, whether its engagement is on- or off-campus.

2.  Defining *Tinker* in the Context of Off-Campus Speech

The Tenth Circuit has fleshed out what constitutes a substantial interference under

*Tinker*.  "A disruption need not actually materialize . . . . so long as the situation 'might

reasonably [lead] authorities to forecast' substantial disruption or interference with the rights of

others."  *Taylor*, 713 F.3d at 36–37 (citing *Tinker*, 393 U.S. at 514).  The "mere . . . discomfort

and unpleasantness that always accompany an unpopular viewpoint" is not sufficient to justify

restricting speech.  *Id.* at 37 (citing *Tinker*, 393 U.S. at 508–09).  Rather, "[f]or a school's

forecast to be reasonable, courts generally require that it be based on a 'concrete threat' of

substantial disruption."  *Id.* (quoting *Sypniewski v. Warren Hills Regional Bd. of Educ.*, 307 F.3d

243, 262 (3d Cir. 2002)).

C.G. argues that *Tinker* as applied to off-campus speech requires additional elements than

*Tinker* as applied to on-campus speech, including either intentional direction towards the school

environment or direct threats to the safety of the school, students or employees.  ECF No. 36 at

6.  I disagree.  Of course, "[t]here is surely a limit to the scope of a high school's interest in the

order, safety, and well-being of its students when the speech at issue originates outside the

schoolhouse gate."  *Kowalski v. Berkeley Cty. Sch.*, 652 F.3d 565, 573 (4th Cir. 2011).  However,

I find that *Tinker* already properly incorporates that limit through its holistic "substantial

disruption" language.

Some courts incorporate intentional direction by considering the "nexus" between the

off-campus speech and the school.  *See, e.g.*, *McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700,

707 (9th Cir. 2019) ("[C]ourts considering whether a school district may constitutionally regulate

off-campus speech must determine, based on the totality of the circumstances, whether the

speech bears a sufficient nexus to the school.").  For example, in *Kowalski v. Berkeley County*

*Schools*, 652 F.3d at 567, the Fourth Circuit considered "a Myspace.com webpage called 'S.A.S.H.,' which [the student] claims stood for "Students Against Sluts Herpes" and which was largely dedicated to ridiculing a fellow student."  The Fourth Circuit found that "the School District was authorized by *Tinker* to discipline Kowalski, regardless of where her speech originated, because the speech was materially and substantially disruptive in that it "interfer[ed] . . . with the schools' work [and] colli[ded] with the rights of other students to be secure and to be let alone." *Id.* at 573–74 (quoting *Tinker*, 393 U.S. at 508, 513) (alterations in original).  The court found disruption based on "the nexus of Kowalski's speech to Musselman High School's pedagogical interests." *Id.* at 573.  Specifically, the student "knew that the electronic response would be, as it in fact was, published beyond her home and could reasonably be expected to reach the school or impact the school environment," and "[s]he also knew that the dialogue would and did take place among Musselman High School students whom she invited to join the 'S.A.S.H.' group and that the fallout from her conduct and the speech within the group would be felt in the school itself." *Id*.

Other courts incorporate intentional direction when analyzing the reasonableness of the school's response.  *See, e.g.*, *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 113 (2d Cir. 2012) (explaining that the *Tinker* "test is an objective one, focusing on the reasonableness of the school administration's response, not on the intent of the student").  For example, in *Porter v. Ascension Parish School Board,* 393 F.3d 608, 611 (5th Cir. 2004), the school expelled a student after the student's brother brought to school a sketchpad containing a two-year-old drawing of an armed attack on the school.  The Fifth Circuit concluded that the speech was protected under

*Tinker* because the drawing "was completed [at] home, stored for two years, and never intended by [the creator of the drawing] to be brought to campus."[1]  *Id.* at 615.

Similarly, in C.G.'s cited case of *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915 (3d Cir. 2011), the court considered intentional direction not as a prerequisite but rather in the context of foreseeable disruption.  The majority found that the school could not have reasonably forecasted substantial disruption when a student created a Myspace profile for the principal containing profanity-laced statements insinuating that he was a sex addict and a pedophile.  *See id.* at 921–22, 925.  The court considered the impact on the learning environment as a whole, noting that "[t]he profile was so outrageous that no one could have taken it seriously," the student had made the profile "private," and "[t]he fact that her friends happen to be Blue Mountain Middle School students . . . does not mean that [her] speech targeted the school."  *Id.* at 930–31.  C.G. cites specifically to the concurrence, which agreed, finding that the student "had no reason to know that [her Myspace profile] would make its way onto campus" because Myspace was blocked on school computers and she had made her profile "private."  *See id.* at 940 (Smith, J., concurring).  Thus even the concurrence to which C.G. cites focuses not on intentional direction, but on foreseeable disruption.  Because of the nature of the speech, the school could not have reasonably forecasted that the speech would cause substantial disruption. The fact that the student did not intend and "had no reason to know" that the profile would reach was relevant in that consideration, but not definitive.

It is worth again mentioning the ever-evolving nature of technology.  The conduct in *Snyder* occurred in 2007—twelve years prior to the 2019 conduct at issue here.  In those twelve

---

[1] It is worth noting that *Porter v. Ascension Parish School Board,* 393 F.3d 608, 615 (5th Cir. 2004), does not involve social media use and therefore lacks an important dimension of the analysis here.

years, smart phones became ubiquitous, social media use exploded, and students gained access to

the internet anytime from anywhere.  It is laughable to compare Myspace access in 2007 to

social media access in 2019.  In 2007 the fact that a school blocked Myspace may have indeed

meant that students would not be able to access the website during the school day.  *See id.*  Yet in

2019 onwards there is little a school can do to prevent students from accessing and discussing

social media on campus throughout the day.  It must be expected that most social media use will

reach campus.  Thus, in considering whether social-media-based speech will cause substantial

disruption, whether a student intentionally directed that speech towards campus is a less useful

analytical tool today.

Indeed, at least one circuit has expressly rejected a discrete intentional-direction

requirement in applying *Tinker* to off-campus speech.  In *Wisniewski v. Board of Education of

Weedsport Central School District*, the Second Circuit considered a student's instant messenger

icon that showed a gun firing a bullet at a person's head with the words, "Kill Mr.

VanderMolen," who was a teacher.  494 F.3d 34, 36 (2d Cir. 2007).  The Second Circuit

affirmed the student's suspension, finding it irrelevant "whether or not [the student] intended his

IM icon to be communicated to school authorities or, if communicated, to cause a substantial

disruption."  *Id.* at 40.

It is true that in *Bell v. Itawamba*, 799 F.3d at 396, the Fifth Circuit held that

"*Tinker* governs our analysis, as in this instance, when a student *intentionally directs* at the

school community speech reasonably understood by school officials to threaten, harass, and

intimidate a teacher, even when such speech originated, and was disseminated, off-campus

without the use of school resources."  *Id.* (emphasis added).  But the court acknowledged the

variety of approaches used by other courts in applying *Tinker* to off-campus speech and that

"such determinations are heavily influenced by the facts in each matter." *Id.* It emphasized "[t]he pervasive and omnipresent nature of the Internet" and expressly refused "to adopt any rigid standard in this instance." *Id.*

C.G. also argues that *Tinker* as applied to off-campus speech requires a direct threat to the school or to a particular teacher or student. Yet none of C.G.'s cited cases indicate that a direct threat is required. As with intentional direction, it is true that where a direct threat is made, substantial disruption to the learning environment is more likely. But it does not logically follow that no substantial disruption occurs in the absence of a direct threat. I will not narrow *Tinker* as applied to off-campus speech as such. Doing so would be contrary to the Tenth Circuit's analysis of substantial disruption, which requires not a threat of physical harm but merely "a 'concrete threat' of substantial disruption." *Taylor*, 713 F.3d at 37 (quoting *Sypniewski v. Warren Hills Regional Bd. of Educ.*, 307 F.3d 243, 262 (3d Cir. 2002)).

As such, I reject C.G.'s attempts to narrow *Tinker* as applied to off-campus speech.

### 3.  Applying *Tinker* to the Facts

C.G.'s post was made off-campus on a Friday evening. The post was visible only to his Snapchat "friends" and only for twenty-four hours, to be automatically deleted before school resumed on Monday; and C.G. ultimately deleted it only hours after posting. Yet the picture itself contained three of C.G.'s classmates, and C.G.'s "friend" list contained many more classmates. C.G. must have known, or should reasonably have known, "that the electronic response would be, as it in fact was, published beyond [his] home and could reasonably be expected to reach the school." *Kowalski*, 652 F.3d at 573. As discussed above, social media use in today's world must generally be expected to reach the school. Although not irrelevant, it is not dispositive that C.G. did not intend the post to reach the school environment.

Additionally, the content of C.G.'s post was more than merely an "unpopular viewpoint." *Taylor*, 713 F.3d at 37.  Nor, in contrast to the student in *Snyder*, 650 F.3d at 930–31, was the post "so outrageous that no one could have taken it seriously."  True, C.G. did not intend "Me and the boys bout to exterminate the Jews" as a legitimate threat, and the school did not take it as such.  But the post was not "so outrageous that no one could have taken it seriously."  Indeed, many students and parents did take it as serious anti-Semitic hate speech.  One of C.G.'s friends immediately showed the post to her father, who found it so concerning as to contact the police.  It spread throughout the Jewish community.  A student's parents contacted Principal Silva before the weekend was over, stating that the post had "generate[d] fear, anger, and sadness" for her son and referencing prior hate speech and hate crimes in the Cherry Creek community.  Over the next few days, multiple news outlets ran stories about the post and three additional parents contacted CCHS about it.  CCHS held an advisory period specifically to address the post and to facilitate discussion between students and faculty about hate speech.

C.G. characterizes these facts as "mild distraction" insufficient to constitute substantial disruption.  ECF No. 36 at 10 (quoting *J.C. ex rel. R.C. v. Beverly Hills Unified Sch. Dist.*, 711 F. Supp. 2d 1094, 1120 (C.D. Cal. 2010)).  But C.G.'s conduct did not cause mere "routine," "[p]etty disagreements among" students and a few corresponding parent complaints.  *T.V. ex rel. B.V. v. Smith-Green Cmty. Sch. Corp.*, 807 F. Supp. 2d 767, 772, 782–83 (N.D. Ind. 2011) (finding insufficient disruption when a group of girls posted "raunchy photographs" of themselves, resulting in "'divisiveness' with the girls on the volleyball teams" because one group of girls approved and one group of girls "wanted to have no part of it").  Nor did C.G.'s conduct result merely in a student who "felt embarrassed" and "temporarily did not want to go to class." *J.C. ex rel. R.C.*, 711 F. Supp. 2d at 1117 (finding insufficient disruption when a student posted a

video to YouTube in which several students made derogatory, sexual, and profanity-laced statements about a classmate).  Such "[p]etty disagreements" and student embarrassment are a routine (if unfortunate) part of the school environment.  On the other hand, anti-Semitic comments—even comments intended as a joke—cause a far more insidious disruption. Although media coverage is not necessarily indicative of disruption in the school environment itself, it is telling that so many news stories ran on C.G.'s post.  It was foreseeable that an anti-Semitic attempt at humor might cause substantial disruption to the learning environment.  The post "was materially and substantially disruptive in that it 'interfer[ed] . . . with the schools' work [and] colli[ded] with the rights of other students to be secure and to be let alone.'"  *Kowalski*, 652 F.3d at 573–74 (quoting *Tinker,* 393 U.S. at 508, 513) (alterations in original).

C.G. also misunderstands the *Tinker* standard by focusing only on the actual disruption. The *Tinker* standard encompasses foreseeable disruption, which includes disruption that the school may have headed off by taking immediate and decisive action.  *See Tinker*, 393 U.S. at 514.  C.G. further implies that the school itself caused much of the disruption.  Yet "cases do not distinguish between 'substantial disruption' caused by the speaker and 'substantial disruption' caused by the reactions of onlookers or a combination of circumstances."  *Dariano v. Morgan Hill Unified Sch. Dist.*, 767 F.3d 764, 778 (9th Cir. 2014).

It is commendable that C.G. recognized his error, took responsibility, and engaged with members of the Jewish community to educate himself more fully.  But it is not this Court's role here to opine on whether or how the school should have disciplined C.G. for his conduct.  It is this Court's role to opine only on whether the school had the authority to do so.  I find that under

*Tinker*, the school did have authority to discipline C.G. for his Snapchat post referencing "exterminat[ing] the Jews."

Accordingly, C.G.'s first claim alleging violations of the First and Fourteenth Amendments for suspending and expelling C.G. is dismissed.

**B.  Second Claim:  First Amendment Facial Challenge**

C.G. also argues that District policies, including JICDA(13), JICDA(19), ACC-R and JKD-1-1E are facially overbroad.  C.G. argues that the policies "violate the First Amendment by allowing students to be suspended or expelled for speech that occurs off-campus, unconnected to a school-sponsored event or activity."  ECF No. 30 ¶ 99.

Facial overbreadth challenges are generally disfavored.  *See West*, 206 F.3d at 1367. "One exception exists, however, to the rule that courts will not pass upon facial challenges to laws.  The exception is First Amendment challenges to laws based on overbreadth."  *Id.* (citing *Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 37–38 (1999)).  Yet the Supreme Court has held that the overbreadth doctrine is "not casually employed."  *United Reporting Publ'g,* 528 U.S. at 39.  The Tenth Circuit has confirmed that "[a] court should address an overbreadth challenge to a law only when the law may have a chilling effect on the free speech rights of parties not before the court."  *West*, 206 F.3d at 1367 (citing *United Reporting Publ'g,* 528 U.S. at 37–38).

Here, "'no realistic danger' exists that [the District's policies] will 'significantly compromise First Amendment protections of parties not before the court."  *Id.* (quoting *Members of the City Council v. Taxpayers for Vincent,* 466 U.S. 789, 801 (1984)).  JICDA(13) prohibits "[e]ngaging in verbal abuse, i.e., name-calling, ethnic or racial slurs, or derogatory statements addressed publicly to others" only to the extent that such conduct "precipitate[s] disruption of the

school program or incite[s] violence."  ECF No. 32-3 at 4.  JICDA(19) prohibits "[b]ehavior on or off school property" only to the extent that such behavior "is detrimental to the welfare, safety, or morals of other students or school personnel."  *Id.*  ACC-R allows suspension or expulsion for "intimidation, harassment or hazing" when such conduct "seriously disrupt[s] the learning environment, undermine[s] a sense of civility, or present[s] a danger to the safety and welfare of students and staff."  *Id.* at 6.  Finally, JKD-1-E prohibits "[b]ehavior on or off school property," only to the extent that such behavior "is detrimental to the welfare or safety of other pupils or of school personnel."  *Id.* at 1.  Thus, the policies facially fall within the *Tinker* standard, allowing the District to discipline students only to the extent that off-campus behavior could foreseeably cause substantial disruption to the learning environment.

C.G.'s only response is that the policies must be overbroad because at the time that C.G. was suspended, only one family had contacted school officials about the Snapchat post.  ECF No. 36 at 13.  C.G. asserts that "[i]f Defendants' policies allow for suspension based on a single complaint that another student used offensive language, then their policies undoubtedly infringe on a substantial amount of protected speech."  *Id.*  Yet as noted above, this argument misunderstands *Tinker*.  *Tinker* does not require even one complaint for a school to take action.  *See Tinker*, 393 U.S. at 514.  Rather, *Tinker* contemplates whether the school could "reasonably forecast[]" substantial disruption.  *Taylor*, 713 F.3d at 36 (citing *Tinker*, 393 U.S. at 513).  And as described above, the school did indeed reasonably forecast disruption in this case.

Accordingly, C.G.'s second claim alleging a violation of the First and Fourteenth Amendments against the District and the Board for adopting unconstitutional policies is dismissed.

C.  **Third Claim:  Due Process**

C.G. claims that C.G. was denied due process throughout the suspension and expulsion

process.  ECF No. 36 at 13–14.  "The Supreme Court decision in *Goss v. Lopez*, 419 U.S. 565

(1975), sets the standard for procedural due process owed to students facing short-term school

suspensions."  *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1240 (10th Cir. 2001).  Under

*Goss*, a suspension of ten days or less requires "that the student be given oral or written notice of

the charges against him and, if he denies them, an explanation of the evidence the authorities

have and an opportunity to present his side of the story."  *Id.*

The *Goss* court also explained that "[l]onger suspensions or expulsions for the remainder

of the school term, or permanently, may require more formal procedures."  *Goss*, 419 U.S. at

584.  The Tenth Circuit has not defined exactly what such formal procedures must look like.  In

considering whether a school's procedures for long-term suspensions or expulsions are

appropriate, the Tenth Circuit applies the balancing test of *Mathews v. Eldridge,* 424 U.S. 319

(1976).  *See Watson*, 242 F.3d at 1240.  "Under *Mathews*, a court must balance three factors: (1)

the private interest that will be affected by the official action, (2) the probable value, if any, of

additional or substitute procedural safeguards, and (3) the government's interest, including the

fiscal and administrative burden, that the additional or substitute procedural requirements would

entail."  *Id.* (citing *Mathews*, 424 U.S. at 334–35).

However, the Tenth Circuit has emphasized that "'[a]ll that is necessary' to satisfy due

process 'is that the procedures be tailored, in light of the decision to be made, to "the capacities

and circumstances of those who are to be heard," to insure that they are given a meaningful

opportunity to present their case.'"  *Watson*, 242 F.3d at 1241 (quoting *Mathews*, 424 U.S. at

349).  The Tenth Circuit has explained that the purpose of this test is to properly balance "[t]he students' interest in unfair or mistaken exclusion from the educational process" and "the school's interest in discipline and order."  *Brown v. Univ. of Kansas*, 599 F. App'x 833, 837 (10th Cir. 2015) (unpublished) (quoting *Watson*, 242 F.3d at 1240) (internal quotations omitted).

C.G. makes several discrete due process arguments regarding his disciplinary process.  I separately consider C.G.'s arguments regarding the suspension decisions and the expulsion decision.

### 1.  Suspension Process

First, C.G. argues that C.G. was not provided adequate notice, opportunity to be heard, or an avenue for appealing his initial suspension or the two extensions of his suspension.  ECF No. 30 ¶¶ 118, 121–22.  C.G. was initially suspended on September 16 for five days through September 20.  On September 18 C.G.'s suspension was extended for an additional five days through September 27.  Later that same day C.G.'s suspension was extended for an additional eleven days through October 21.

C.G. argues that I should consider each suspension and expulsion decision separately in evaluating whether due process was provided.  Defendants argue that it is wrong to segregate the discipline into phases because it was all tied to the same conduct—the Snapchat post—and the suspensions were subsumed by the ultimate expulsion.  I take the middle ground.  I agree with C.G. that it is necessary to consider each disciplinary decision in considering whether due process was provided.  However, because each decision was made in relation to the same conduct, the procedure afforded at one stage of the disciplinary process may be sufficient at a subsequent stage.

C.G.'s initial five-day suspension is governed by *Goss*.  For short-term suspensions under ten days, *Goss* requires only "that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story."  *Watson*, 242 F.3d at 1240.  Here, C.G.'s complaint alleges that "[Dean] Thomas notified C.G. that he was suspended . . . while CCHS investigated how his off-campus speech impacted the school environment."  ECF No. 30 ¶ 51.  C.G. further alleged that he was "in [Dean] Thomas's office for hours."  *Id.*  This constitutes sufficient notice and opportunity to be heard under *Goss*.

C.G. also argues that he was denied an opportunity to appeal the suspension.  *Goss* does not constitutionally require such heightened process.  Further, District policy JIII-R does allow students to file a complaint of "a violation or inequitable application" of any Board policy.  ECF No. 32-3 at 10–11.  The fact that C.G. did not take advantage of this policy does not mean that he did not have the opportunity to do so.

The first, five-day extension brought the total suspension to ten days.  Such a suspension is still governed by *Goss*.  Dean Thomas informed C.G.'s mother of the extension, and Assistant Principal Uhlig sent a follow-up letter confirming this decision.  This constitutes sufficient notice.  And because this extension was made for the same reasons as the initial suspension, C.G. had sufficient opportunity to be heard vis-à-vis the initial discussion with Dean Thomas.

The second, eleven-day extension brought the total suspension to twenty-one days and out of the realm of short-term suspensions under *Goss*.  In considering whether "more formal procedures" were required under the *Mathews* test, "the issue is whether greater protections would have proved beneficial."  *Brown*, 599 F. App'x at 837.  Here, C.G. does not expressly specify what additional procedures were required beyond an opportunity to be heard on the

decision to extend.  He argues that C.G.'s parents were not given notice of a time and place they could meet with Dean Thomas or Assistant Principal Uhlig to review the suspension extension, in violation of District Policy JKD-1-R.  ECF No. 30 ¶ 65.

Preliminarily, "a school's failure to comply with its own rules 'does not, in itself, constitute a violation of the Fourteenth Amendment.'"  *Brown*, 599 F. App'x at 838 (quoting *Hill v. Trs. of Ind. Univ.*, 537 F.2d 248, 252 (7th Cir. 1976)).  Further, C.G. had an opportunity to be heard when Dean Thomas informed him of the initial suspension decision.  C.G. has never denied that the conduct occurred; he argues only that the school did not have the authority to discipline him for the conduct.  Significantly, the extension decision was made for the express purpose of facilitating an expulsion review process for answering that question.  In light of these facts, more formal procedures for the second suspension decision would have added little.

Second, C.G. argues that C.G.'s conduct did not violate the policies relied upon in suspending him.  ECF No. 30 ¶¶ 119–20.  As discussed above, I disagree.

### 2.  Expulsion Process

C.G. also alleges deficiencies in the subsequent expulsion process.  First, C.G. alleges that defendants violated Colorado law and District policy requiring the Superintendent to review the hearing officer's factual findings and recommendation and issue a written decision within five days of the expulsion hearing.  *Id.* ¶¶ 76–77, 116.  Superintendent Siegfried did not adopt the hearing officer's recommendation of expulsion until fourteen days after the hearing.  However, "a violation of state law does not state a Constitutional due process claim."  *Storie v. Indep. Sch. Dist., No. 13*, 834 F. Supp. 2d 1305, 1309 (E.D. Okla. 2011) (citing *Nordlinger v. Hahn,* 505 U.S. 1, 26 (1992)); *cf. White v. Salisbury Tp. Sch. Dist.*, 588 F. Supp. 608, 614 (E.D. Pa. 1984) ("[W]here a state has issued regulations requiring school districts to promulgate and

publish specific procedural rules and safeguards governing suspensions, a failure to comply with those regulations would violate state law *only* and would not rise to the level of a constitutional violation.").  Nor, once again, is a school's failure to comply with its own rules enough to constitute a due process violation  *Brown*, 599 F. App'x at 838 (quoting *Hill v. Trs. of Ind. Univ.*, 537 F.2d 248, 252 (7th Cir. 1976)).

Second, C.G. argues "[i]n their attempt to justify their punishment of C.G., Defendants repeatedly exaggerated or obscured facts and engaged in perjury."  ECF No. 30 ¶ 126.  C.G. does not expressly clarify to what he refers, but presumably he refers to his allegations that: (1) Assistant Principal Uhlig testified that he was unaware that C.G. had posted an apology to his Snapchat feed, despite the fact that he had received a screenshot of C.G.'s apology post via email and forwarded it to other school officials four hours before he decided to recommend expulsion; and (2) Assistant Principal Uhlig also testified that the post caused "extreme outcry of concerned community members and students . . . over fear to come to school" and "fear to access education," despite C.G.'s allegation that in fact "[n]o student expressed fear about coming to school . . . and no student was afraid to access education."  ECF No. 30 ¶¶ 71–72.

These allegations are insufficient to support a due process violation.  "In order to establish a denial of due process, a student must show substantial prejudice from the allegedly inadequate procedure."  *Watson*, 242 F.3d at 1242 (citing *United States v. Kennedy,* 64 F.3d 1465, 1473 (10th Cir. 1995), *Moore v. Reynolds,* 153 F.3d 1086, 1111 (10th Cir. 1998), *Keough v. Tate County Board of Ed.,* 748 F.2d 1077 (5th Cir. 1984)).  It is unclear how Principal Uhlig's alleged lie regarding the apology post is relevant.  C.G. does not allege that C.G.'s apology post affects the school's constitutional authority to discipline C.G.  Nor does C.G. allege that the alleged lie influenced the school's decision on whether or how to discipline C.G.  Regardless of

whether Assistant Principal Uhlig knew about the apology post when he made the decision to recommend expulsion, C.G. subsequently had ample opportunity to present his side of the story. At the expulsion hearing he was represented by counsel and was able to present evidence. Further, it was Superintendent Siegfried, not Assistant Principal Uhlig, who ultimately made the decision to accept the hearing officer's recommendation to expel C.G.

Additionally, C.G.'s allegation that Assistant Principal Uhlig exaggerated or lied about the "extreme outcry of concerned community members and students" is facially incorrect. ECF No. 30 ¶ 72. C.G.'s complaint indicates that one student immediately showed the post to her father; the post spread through the Jewish community; another family contacted Principal Silva before the weekend was over to express that their son was fearful and angry; multiple news outlets ran stories on the post; three additional parents subsequently contacted CCHS about the post; and CCHS saw fit to dedicate an advisory period to hate speech. C.G. cannot argue in good faith that Assistant Principal Uhlig was exaggerating or lying about the community's outcry just because no student directly confronted school officials about their discomfort.

Third, C.G. argues in his response that C.G. did not have the opportunity to "meaningfully assert his First Amendment right[s]" during the expulsion hearing. ECF No. 36 at 14. Although C.G. did assert a First Amendment argument at the hearing, he takes issue with the hearing officer's conclusion that she could not determine issues of law, including whether C.G.'s speech was protected by the First Amendment. C.G.'s assertion that the expulsion hearing should have made a finding on his First Amendment rights constitutes an assertion that the school should have included more formal procedures under *Goss*. In analyzing such an argument, I must use the *Mathews* balancing test. *See Watson*, 242 F.3d at 1240. C.G. has a strong private interest in his education and in avoiding unfair exclusion from the education

process.  *See Goss*, 419 U.S. at 576 ("'[E]ducation is perhaps the most important function of state and local governments,' and the total exclusion from the education process for more than a trivial period . . . is a serious event in the life of the suspended child." (quoting *Brown v. Board of Education*, 347 U.S. 483, 493 (1954)); *Brown*, 599 F. App'x at 837 (explaining that applying the *Mathews* test to serious public school discipline properly balances "'[t]he students' interest in unfair or mistaken exclusion from the educational process' and 'the school's interest in discipline and order.'" (quoting *Watson*, 242 F.3d at 1240)).  Defendants do not dispute this serious due process interest.

The parties do not address the relative benefits and burdens of instituting a requirement that expulsion hearing officers be empowered to make not just factual findings, but also constitutional findings.  However, the Tenth Circuit has repeatedly emphasized that *Goss*'s requirement of "more formal procedures" is "not necessarily the equivalent of a trial," *Brown*, 599 F. App'x at 837, and that "public school districts are not courts of law," *West*, 206 F.3d at 1364.  School disciplinary hearings are intended to address whether, as a factual matter, the student violated district policy.  *See Goss*, 419 U.S. at 584 (describing informal disciplinary hearings as operating in a "factfinding function" that allows the student "the opportunity to characterize his conduct and put it in what he deems the proper context"); *cf. West*, 206 F.3d at 1364 (rejecting student's argument that he was denied a "meaningful" hearing because the school did not address whether he "intended" to harass or intimidate anyone in violation of district policy).  Imposing a requirement that disciplinary hearings must address constitutional questions is beyond that scope and would risk "overwhelming[ing] administrative facilities in many places and, by diverting resources, cost more than it would save in educational

effectiveness." *Id.* at 583.  The proper route for C.G.'s First Amendment argument is with this Court.

Thus, I find that although C.G. has a strong interest in his uninterrupted education, the probable value of requiring school disciplinary hearings to address constitutional questions does not outweigh the school's interest in discipline and order.  Accordingly, C.G.'s third claim alleging a violation of Fourteenth Amendment procedural due process rights is dismissed.

### D.  Fourth Claim:  Due Process Facial Challenge

C.G. presents a due process facial challenge alleging that the District's policies are vague and overbroad.  As discussed, overbreadth challenges are generally disfavored and heavily scrutinized.  *See West*, 206 F.3d at 1367 ("[W]e believe cases of alleged unconstitutional enforcement of a public school district's disciplinary policies, like any other laws, are best addressed in most instances 'when (and if) they arise, rather than prophylactically through the disfavored mechanism of a facial challenge.' (quoting *City of Chicago v. Morales,* 527 U.S. 41 (1999) (Thomas, J., dissenting)).

To establish that policies are unconstitutionally vague, a plaintiff can show that "a reasonable student of ordinary intelligence who read the policy could not understand what conduct it prohibited."  *Id*. at 1368 (citing *Broadrick,* 413 U.S. at 608 (full cite)).  Yet "[g]iven the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, . . . school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions."  *Id.* (quoting *Bethel Sch. Dist.,*478 U.S. at 686) (internal quotations omitted) (alterations in original).

Here, C.G.'s complaint does not expressly clarify which District policies he challenges.  I assume he refers to the three policies referenced elsewhere in the complaint: JDK-1-E, JICDA,

and ACC-R.  C.G.'s complaint alleges only that the policies are overbroad "because they provide school officials unbridled discretion to discipline students," including for off-campus speech; "the language used is ambiguous and criteria for discipline are entirely subjective"; and "they do not allow a person of ordinary intelligence to determine what conduct the policies prohibit." ECF No. 30 ¶¶ 134–37.

C.G. appears to abandon this claim, as he does not address it in his response to defendants' motion to dismiss.  As such, C.G. does not provide any argument or point to any specific language indicating that the policies are overbroad.  More importantly, I find that the policies do plainly specify what conduct is prohibited such that a person of ordinary intelligence could understand.  I have already discussed the sufficiency of the specific language of the policies in the context of the looser standard of C.G.'s First Amendment overbreadth challenge.

Further, to the extent that C.G. challenges on vagueness grounds the language in policies JKD-1-E and JICDA, which permit discipline for behavior "which is detrimental to the welfare or safety of other pupils or of school personnel" or is "detrimental to the welfare, safety, or morals of other students or school personnel," the Colorado Supreme Court has already addressed the issue.  This language comes directly from Colo. Rev. Stat. § 22-33-106(1)(c).  In *People in Interest of K.P.*, 514 P.2d 1131, 1133 (Colo. 1973), the Colorado Supreme Court rejected a vagueness challenge to Colo. Rev. Stat. § 22-33-106(1)(c), concluding "the legislature has provided factors in sufficiently clear and definite language to apprise students of the type of conduct which is prohibited."

Accordingly, C.G.'s due process overbreadth claim is dismissed.

### E.  Fifth Claim:  § 1983 Conspiracy

Finally, C.G. brings a conspiracy claim under § 1983.  "To state a conspiracy claim under § 1983, a plaintiff must plead that he was deprived of a constitutional right as a result of a conspiracy comprised of or including conspirators acting under color of state law." *Leatherwood v. Rios*, 705 F. App'x 735, 739 (10th Cir. 2017) (citing *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 & n.6 (10th Cir. 1990)).  C.G. fails to state a § 1983 conspiracy claim because, as described above, he failed to establish a constitutional violation.  *See id*.

Accordingly, C.G.'s fifth claim for conspiracy under § 1983 is dismissed.


## ORDER

Defendant's motion for summary judgment, ECF No. 32, is GRANTED.  The Court dismisses plaintiff's amended complaint in its entirety.

DATED this 10th day of August, 2020.


BY THE COURT:

_____
R. Brooke Jackson
United States District Judge