IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge R. Brooke Jackson

Civil Action No. 1:19-cv-03346-RBJ

CI.G, on behalf of his minor son, C.G.

    Plaintiff,

v.

SCOTT SIEGFRIED, Superintendent of Cherry Creek School District,
CHRIS SMITH, Chief of Staff for the Educational Services Center of Cherry Creek School District,
RYAN SILVA, Principal of Cherry Creek High School,
KEVIN UHLIG, Assistant Principal of Cherry Creek High School,
BRYNN THOMAS, Dean at Cherry Creek High School, and
CHERRY CREEK SCHOOL DISTRICT NO. 5.

    Defendants.

---

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

---

This matter is before the Court on the parties' cross-motions for summary judgment at ECF Nos. 84 and 85. Both motions are DENIED.

## FACTS

This case concerns a student's suspension and expulsion from Cherry Creek School District No. 5 ("CCHS") in the 2019-20 school year. *See* ECF No. 30 ¶¶ 32, 77.[1] On the evening of Friday, September 13, 2019, the student—C.G.—and three friends visited a thrift shop. C.G. posted a photograph of his friends wearing wigs and hats, including one hat that

---

[1] Factual statements supported by citation to the complaint are not disputed for purposes of these cross motions.

1

resembled foreign military apparel from the World War II era, with the caption "me and the boys bout to exterminate the Jews." *See id*. ¶¶ 34-35. People who were "friends" with C.G. on Snapchat were able to view the post, but C.G. did not tag anyone or send the picture directly to anyone. *Id*. ¶¶ 40-41. At least 75 percent of these dozens of "friends" were also students at CCHS. ECF No. 84-1 at 2; ECF No. 84-4 at 8.

One "friend" took a screenshot of the post and showed it to her father, who called the police. ECF No. 30 ¶ 40-41. The news also spread to "others in the Jewish community." *Id*. ¶ 4. Officers responded to C.G.'s house and determined that there was no active threat. *Id*. ¶ 44. After learning of the negative reaction in the community and within hours of the original post, C.G. deleted the original post and posted an apology to his Snapchat story that stated, "I'm sorry for that picture it was ment [sic] to be a joke." *Id*. ¶ 45.

School officials were also contacted about the post. *Id*. ¶ 6. The next day, Saturday, September 14, a CCHS student's father emailed the post to Principal Silva and others. ECF No. 84-2 at 2-3, 9. The father, Ben Litvin, wrote, "This is completely unacceptable and should not be tolerated at Cherry Creek." In a follow up email, Mr. Litvin urged the school "to do a threat assessment first thing Monday to ensure the safety of the students there." ECF No. 84-2 at 3, 9. Mr. Silva forwarded Mr. Litvin's email and the post to Assistant Principal Kevin Uhlig, his direct supervisor Carla Stearns, and the District's Superintendent Scott Siegfried. *See* ECF No. 84-2 at 3-4, 15.

The same day, Jillian Feiger, an outside sponsor for the Jewish Student Connection club, emailed school officials. She stated that a student who wished to remain anonymous had contacted her and told her that C.G. was responsible for the post, and that the post had been "sent to many other students." ECF No. 84-2 at 3.

2

The next day, September 15, 2019, Ilana Spiegel, a CCHS student's mother, emailed school officials and others. ECF No. 32-1 at 3; ECF No. 84-2 at 16. The student's mother stated that the picture "ha[d] been widely circulated throughout the Jewish community th[at] weekend" and "generate[d] fear, anger, and sadness for [herself and her husband], and most importantly [her son] who ha[d] a class with at least one of the students identified in the picture." *Id*. The mother also referenced prior anti-Semitic activity at CCHS and asked the school to use this incident to address the rise in hate speech and hate crimes in the Cherry Creek community. ECF No. 30 ¶ 56; ECF No. 84-2 at 16. In a follow-up email, Ms. Spiegel shared that her son was concerned about attending science class with C.G. and would walk out if C.G. was present on Monday. ECF No. 84-2 at 16, 18. Mr. Silva scheduled a meeting with Jack Spiegel for Monday, September 16, 2019 before school.

Mr. Silva also received emails about the post from Paul Allen, parent of another CCHS student and member of the Jewish Student Connection club, Zoe Allen. He asked Mr. Silva "to know PRECISELY what [wa]s being planned at Creek to address rampant antisemitism amongst your students." ECF No. 84-2 at 3, 34. In addition, Mr. Allen shared that "[s]ince moving to the area six years ago our two kids have encountered frequent antisemitic remarks, graffiti and offensive social media posts from classmates such as [C.G.'s post]." *Id*. at 34.

On Sunday September 15 at 7:30pm, Superintendent Siegfried emailed Principal Silva, Ms. Stearns, and other officials with the subject line "Information for Tomorrow." This email included four numbered items under the heading "Ryan," denoting information directed to Principal Silva. That section of the email reads (without introduction or explicit characterization of the numbered items as instructions versus mere considerations),

3

> 1. Pull all 4 kids ASAP in the morning (3 in the picture and the one who took and posted it)
> 2. Provide due process
> 3. 5 day suspension from school, remove from athletics/activities and homecoming for the week
> 4. Request from my office an additional 5 day suspension and appropriateness of an expulsion review.

ECF No. 84-2 at 50-51.  The email instructed another official to obtain a copy of the police report and concluded, "[w]e can discuss after Ryan calls Carla with info in the morning." *Id*.

Principal Silva planned with Assistant Principal Uhlig that security would "escort the students involved from period 1 as they arrive[d]" on the following Monday morning, and then that the respective Deans of Students would meet with and question each involved student.  ECF No. 32-1 at 1.  He also explained,

> When an incident happens off campus, we have to make sure there is a nexus to school. This is the case because our primary function is not to police the community. If we can make a case that there is a nexus to school, we can address a situation that happened away from school. In this case, I feel the learning environment has been impacted.

ECF No. 4-2 at 21; *see also* ECF No. 84-2 at 4-5 (Mr. Silva's declaration noting that "it was apparent that the post had quickly spread amongst a C[C]HS community that had suffered anti-Semitism before, and was generating fear, anger, and sadness" and that he "believed that without administrative action, the impact would continue to grow and interfere with CCHS's ability to operate effectively and offer a meaningful education to all students free from harassment and threats").

Early that Monday morning on September 16, 2019, CCHS School Resource Officer sent Assistant Principal Kevin Uhlig a copy of the original post and C.G.'s subsequent apology.  ECF

4

No. 30 ¶ 48; ECF No. 84-2 at 5, 60-61.  Assistant Principal Uhlig forwarded the email, with attachments, to other school officials.  ECF No. 84-3 at 2.

Later on Monday morning, school security met C.G. at his first period class and escorted him to Dean of Students Brynn Thomas's office.  *Id*. ¶¶ 49–50.  When C.G. arrived, his backpack was searched, and Ms. Thomas advised him that he was brought into the office because of the September 13, 2019 Snapchat post, which she said had caused families to feel unsafe sending their kids to school.  ECF No. 84-3 at 3.  Ms. Thomas then asked C.G. to tell his side of the story.  *Id*.; *see also* ECF No. 84-4 at 155:17-20 (C.G. testifying that Ms. Thomas gave him an opportunity to explain the post before suspending him).  C.G. stated that he had been instructed not to discuss the incident.  *Id*.  Ms. Thomas then asked C.G. to put that in writing, and he complied.  ECF No. 84-3 at 7 ("I have been instructed to not talk about anything.").

During the meeting, Dean Thomas also called C.G.'s mother, Ms. G., and shared the same information.  ECF No. 84-3 at 3.  Ms. G. stated that police arrived at her home on Friday, September 13, 2019 to discuss the post, that C.G. took down the post, and that he posted an apology.  *Id*.  Dean Thomas then informed C.G. that he was suspended for five days through September 20, 2019 with the possibility of an expulsion review and discussed the necessity of a Threat Assessment to be completed by C.G.'s parents.  ECF No. 84-3 at 3-4.

Meanwhile, the District had begun receiving media inquiries that morning, and Mr. Silva felt a communication to the community was needed to attempt to calm the disruption from the post.  ECF No. 84-2 at 6.  To that end, he began working with District administration on drafting a message to the CCHS community. Id. Mr. Silva also continued to communicate about the post with concerned parents and community members by phone and email.  ECF No. 84-2 at 7.  CCHS's office staff fielded calls about the post from across the country, and messages were sent

via social media. *Id*. Numerous CCHS staff members expressed concern about the post as well, and at least two teachers changed their lesson plans on Monday, September 16, 2019. *Id*.

That afternoon, Principal Silva sent an email to the CCHS community, including students, parents, and staff, about the "anti-Semitic social media post over the weekend." ECF No. 30 ¶ 58. Principal Silva explained that the school "was investigating to determine the impact on the school environment and will take appropriate action." *Id*. He emphasized that CCHS "does not tolerate hateful speech or actions," and that CCHS's "responsibility is to keep students safe and to provide a place where students of every race, ethnicity, religion, gender and sexual orientation feel safe, valued and supported." *Id*.; ECF No. 32-2.

Over the next few days, Mr. Silva also continued to meet with concerned students about the post, including the President of the Jewish Student Connection club on Tuesday, September 17, 2019, and with dozens of members of the Jewish Student Connection club on Wednesday, September 18, 2019. ECF No. 84-2 at 7. He also discussed the post during the week with the Principal's Advisory Council, CCHS's student senate, and the student newspaper staff. *Id*. Additional CCHS parents emailed Mr. Silva, too, sharing their concerns about the post and past anti-Semitic incidents involving their children at CCHS and other District schools. *See, e.g.*, ECF No. 84-2 at 73, 78-79, 81, 84-85.

On September 18, 2019 Dean Thomas informed C.G.'s mother that C.G.'s suspension was being extended for five additional days through September 27, 2019 to facilitate an expulsion review process. *Id*. ¶ 64. Assistant Principal Uhlig sent a follow-up letter confirming this decision. *Id*. Later that same day, Chief of Staff Smith notified C.G. that his suspension was being extended an additional eleven school days through October 21, 2019 (which spanned CCHS's scheduled fall break) to allow for completion of the expulsion process. *Id*. ¶ 66.

Based on feedback he had received when communicating about the post with students, staff, and community members, Mr. Silva planned a structured lesson that was used for all of CCHS's approximately 3,800 students during the next school-wide advisory period on Monday, September 23, 2019. ECF No. 84-2 at 7-8; see also ECF No. 30, ¶ 63. His goal was to provide CCHS students a dedicated opportunity to process how hate can impact the entire school community in an individualized and non-threatening way. ECF No. 84-2 at 7-8.

Also on September 23, 2019, C.G.'s parents sent a packet to Superintendent Siegfried, Chief of Staff Smith, District Director Sterns, Principal Silva, Assistant Principal Uhlig, Dean Thomas, and other District officials that included a letter from C.G. accepting full responsibility for the Snapchat picture, apologizing for his behavior, explaining that it was an impulsive lapse of judgment not intended to hurt anyone, and stating that he had recently spent time educating himself about Jewish history and talking with Jewish community members and advocacy groups; a letter from C.G.'s parents reiterating C.G.'s journey of education and reticence; and letters from community members who know C.G. and his family requesting that CCHS turn this into "a learning opportunity." *Id*. ¶ 68. On September 24, 2019 C.G.'s mother followed up on this information and requested a meeting with District officials. *Id*. ¶ 69. District Director Stearns explained there would be no meeting and noted that C.G. was set for an expulsion hearing. *Id*.

The District held the expulsion hearing on October 7, 2019. *Id*. ¶ 70. At the hearing C.G. asserted that his speech was protected by the First Amendment, and school officials testified about the "nexus" with the school environment and impact on the school community. *Id*. ¶¶ 72-73. The hearing officer issued specific findings and ultimately recommended expulsion. *Id*. ¶ 75. On October 21, 2019 Superintendent Siegfried issued a decision reviewing and adopting the hearing officer's factual findings and recommendation. *Id*. ¶ 76. C.G. appealed

Superintendent Siegfried's decision to the Board, which held a hearing on December 2, 2019 and voted to affirm the decision. *Id*. ¶ 78.

CI.G. filed a complaint on November 26, 2019 on behalf of C.G., alleging violations of the First and Fourteenth Amendments against Superintendent Siegfried, Principal Silva, Chief of Staff Smith, Dean Thomas, and Assistant Principal Uhlig, Director Stearns, and the Board. *Id*. ¶ 79-94. Defendants collectively moved to dismiss C.G.'s complaint in its entirety for failure to state any claim. *See*, *generally*, ECF No. 32. Individual defendants also asserted qualified and absolute immunity. *See id*. I then agreed that C.G.'s off-campus speech could be regulated in this case and, applying the *Tinker* standard, dismissed C.G.'s free speech claim. ECF No. 44. I also dismissed C.G.'s related civil conspiracy and due process claims. *Id*. As a result, there was no occasion to resolve the individual defendants' assertions of qualified and absolute immunity. *Id*.

While this case was on appeal, the Supreme Court addressed regulation of off-campus speech in *Mahanoy Area School District v. B.L.*, 141 S. Ct. 2038 (2021). Applying that new authority, the Tenth Circuit reversed the dismissal of his free speech claim. *CI.G v. Siegfried*, 38 F. 4th 1270, 1277-79 (10th Cir. 2022). The Tenth Circuit affirmed in part and reversed in part the dismissal of C.G.'s due process and conspiracy claims. *Id*. at 1280-82. Because this Court had not reached the assertions of immunity, the Tenth Circuit remanded for consideration of those defenses. *Id*. at 1280, 1282. The Individual Defendants maintained their assertions of qualified and absolute immunity and renewed their motion to dismiss C.G.'s claims against them on that basis. *See* ECF No. 58. This Court granted in part and denied in part that motion to dismiss, granting qualified immunity to the individual defendants and denying absolute immunity to Superintendent Sigfreid. ECF No. 71.

The parties then filed cross-motions for summary judgment, notwithstanding the Court's indication that disposition of this case will require resolution of contested fact issues and that motions for summary judgment would be unavailing. ECF No. 83. After reviewing the motions for summary judgment at ECF Nos. 84 and 85, the Court finds that indeed there are contested issues of material fact and that summary judgment is inappropriate.

## LEGAL STANDARD

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party. *Id*. However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

Rather, the nonmoving party must offer "specific facts that would be admissible in evidence in the event of trial, from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). Stated differently, the party must provide "significantly probative evidence" supported by materials such as "affidavits, deposition transcripts, or specific exhibits incorporated therein" that would support a verdict in her favor. *Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012). Where different ultimate inferences may be drawn from the evidence presented by the parties,

substituting "the sterile bareness of summary judgment" for the advantages of trial before a live jury with live witnesses is not appropriate. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 176 (1970) (Black, J., concurring); *see also Brown v. Parker-Hannifin Corp.*, 746 F.2d 1407, 1411 (10th Cir. 1984).

## ANALYSIS

In the minute order at ECF No. 83, I discouraged the parties from filing motions for summary judgment, as no issue of law had been identified that could resolve the case without development of the facts, and therefore doing so would be an unnecessary expenditure of the parties' and the Court's resources. I find now that existing fact issues preclude summary disposition.

### I. First Amendment claim.

Plaintiff moves for summary judgment on the First Amendment claim, arguing that *Mahanoy Area School District v. B. L. by & through Levy* set out a "new framework" for analyzing the permissibility of regulating off-campus student speech and dictates as a matter of law that the district could not lawfully discipline C.G. for his antisemitic post. *See* ECF No. 85 at 9 (citing 141 S. Ct. 2038, 2047 (2021)). Plaintiff argues that in *Mahanoy*, the Supreme Court "jettisoned" the earlier *Tinker* standard, which permits schools to regulate off-campus speech that creates a reasonable forecast of substantial disruption. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 514 (1969). He argues instead that schools under *Mahanoy* may regulate only if there is an *actual* disruption, and that because here, the record does not reflect an actual disruption, summary judgment in his favor is warranted. *See* ECF No. 85 at 10.

This characterization is simply untrue. The Court in *Mahanoy* emphasized the limited the scope of its opinion, clarifying that the opinion did not seek to "set out a broad, highly general

10

First Amendment rule" regarding when off-campus speech may be regulated and instead merely "mention[ed] three features of off-campus speech" that might diminish the school's interest in regulating that speech compared to on-campus speech. 141 S. Ct. at 2045. The Court did not state or imply that it was overruling *Tinker*; to the contrary, it cited *Tinker* repeatedly and wove the *Tinker* standard throughout its analysis. *See, e.g.*, *id*. at 2045 ("Finally, in *Tinker*, we said schools have a special interest in regulating speech that materially disrupts classwork or involves substantial disorder or invasion of the rights of others.") (internal quotations omitted); *see also id*. at 2046 (acknowledging "a school's special need to prevent, e.g., substantial disruption of learning-related activities" and its obligation to "protect[] those who make up a school community").

Although plaintiff quotes just the snippet of *Mahanoy* referring to the school's interest in regulating speech that "materially disrupts classwork," this excised quotation is misleading. The Court in *Mahanoy* explicitly imported the *Tinker* standard, under which the Court considered whether there were facts in the record "which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities," *or alternatively*, whether any "disturbances or disorders on the school premises in fact occurred." 393 U.S. at 514.

The fact that the Court in *Mahanoy* first quoted the complete language from *Tinker* then later quoted only relevant snippets of that language does not suggest that the Court meant to effect a change in that standard by silent fiat, particularly when it particularly disclaimed doing so. *See* 141 S. Ct. at 2046 (emphasizing that it could "say little more than this: Taken together, these three features of much off-campus speech [enumerated in the opinion] mean that the leeway the First Amendment grants to schools in light of their special characteristics is

11

diminished"). *Mahanoy* itself implicitly acknowledges that disruption need not actually occur to justify a school's intervention. *See* 141 S. Ct. at 2040 (acknowledging repeatedly in its analysis under *Tinker* the "school's interest in *preventing* disruption") (emphasis added).

Moreover, *Tinker* has not been interpreted as plaintiff asserts, to require a showing of actual disruption. *See*, *e.g.*, *Morse v. Frederick*, 551 U.S. 393, 399, 437 (2007) (discussing under *Tinker* whether the speech created a "*risk* of substantial disruption" and emphasizing that "*Tinker* requires a specific and significant *fear* of disruption") (quoting then-Judge Alito in *Saxe v. State College Area School Dist.*, 240 F.3d 200, 211) (emphases added); *see also Thompson v. Ragland*, 23 F.4th 1252, 1259 (10th Cir. 2022) (holding that the school's "halting further distribution of the dolls [the speech at issue] was justified under *Tinker* by the *reasonable belief* that further substantial disruption would occur") (emphasis added).

The correct standard here involves weighing the characteristics of the speech—such as "features that would place it outside the First Amendment's ordinary protection"—against the school's interest in regulating that speech—such as its interest in preventing substantial disruption or invasion of the rights of other students. *See Mahanoy*, 141 S. Ct. at 2047. Therefore, neither *Mahanoy*'s analytical framework nor *Mahanoy*'s holding—that the school there could not discipline the cheerleader for her disparaging comments—dictate the conclusion here that the school officials could not lawfully regulate C.G.'s speech.

In several important respects, the facts in *Mahanoy* differ from those here. It is true that in both cases, the speech took place off campus, outside of school hours, and on Snapchat. However, the Court described the school's interests in *Mahanoy* as "primarily an interest in prohibiting students from using vulgar language to criticize a school team or its coaches" and secondarily, interests in "teaching good manners" and preventing detriments to the "morale" of

12

the cheerleading squad. *See* 141 S. Ct. at 2047-48. Here, the statement about "exterminat[ing] the Jews" implicates far more than an interest in teaching good manners or deterring vulgarity—it implicates the school's mandates to ensure student safety and preserve a learning environment free of discrimination.

Moreover, the population whose "morale" would be potentially affected was far more substantial here than the Junior Varsity cheerleading squad in *Mahanoy*, and the sites of potential disruption were both curricular and extracurricular. *Cf. Mahanoy*, 141 S. Ct. at 2048. There was no aggravating historical context in *Mahanoy* analogous to the history of antisemitic graffiti and threats at CCHS, which tends to legitimize officials' concern here over the effect of the post on the school community. *See* ECF No. 84-2 at 34. And unlike in *Mahanoy*, where the coach of the cheer squad testified that she had no "reason to think that this particular incident would disrupt class or school activities other than the fact that kids kept asking [about it]," the record here is replete with testimony from the school officials about the reasons they believed the incident *would* disrupt class and school activities—including the history of antisemitic incidents at the school, the emails from parents requesting assurances, communications from students and student groups that they did not want to be in class with C.G., and media attention. *Cf. Mahanoy*, 141 S. Ct. at 2047. Given these significant distinctions from *Mahanoy*, this Court cannot decide as a matter of law that the school's regulation was unlawful.

The Court likewise cannot decide as a matter of law that the officials *were* reasonable in forecasting that the incident would cause a substantial disruption. Plaintiff's motion for summary judgment identifies facts in the record that do tend to mitigate the effect of the post—both forecasted and actual—on the school environment. For example, C.G. posted an apology on Friday evening via the same platform and to the same audience, apologizing and describing

13

the initial post as a joke, which tends to reduce the extent to which it was reasonable for officials to interpret the post as a threat to other students. ECF No. 30 ¶ 45. No students have been identified as staying home from school or missing class because of the post, ECF No. 84-2 at 5-6, and a reasonable jury could interpret the interruptions to classes—including two teachers' modified lesson plans on Monday morning and an instructional period devoted to discussions of tolerance, ECF No. 84-2 at 7—as limited enough to not constitute a substantial disruption to the learning environment.

Because there is at least a genuine dispute as to whether the school officials were reasonable in forecasting a substantial disruption from the post, the resolution of this issue of fact is not appropriate at summary judgment. The cross motions on the First Amendment claims are both denied.

## II.     Procedural Due Process claims.

### a.  Suspension less than 10 days.

The Supreme Court decided the procedural due process requirements for short-term suspensions of fewer than ten days in *Goss v. Lopez*, 419 U.S. 565 (1975). *Goss* requires "that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *See Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1240 (10th Cir. 2001) (citing Goss, 419 U.S. at 581).

*Goss* does not set out strict requirements for the form of the notice and hearing, and in fact contemplates "in the great majority of cases" that the hearing requirement will be satisfied by an "informal exchange" between the disciplinarian and the student. *Goss*, 419 U.S. at 582; *see also id.* at 579 (requiring, at a minimum, that "students facing suspension and the consequent

14

interference with a protected property interest must be given *some kind of notice* and afforded *some kind of hearing*") (emphasis added).  *Goss* also provides for some flexibility in the timing of these notice and hearing requirements.  While "as a general rule notice and hearing should precede removal of the student from school," the Court recognized that when a student's "presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process," the student may be immediately removed from school, and in that case, "the necessary notice and rudimentary hearing should follow as soon as practicable."  419 U.S. at 582-83.

Here, plaintiff contends that the suspension decision was made before he was called into Dean Thomas's office on Monday and given the opportunity to tell his side of the story, and that therefore the meeting was not a "meaningful" hearing within the meaning of the Due Process Clause.  *See* ECF No. 85 at 14 (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985), which considered whether a hearing occurred at a meaningful time in the context of termination of employment).  The school officials maintain that no decision was made to suspend C.G. until after he spoke with Dean Thomas on Monday morning.  *See* ECF No. 84 at 17 (citing the depositions of Principal Silva and Dean Thomas); *see also* ECF No. 84-4 at 155:17-20 (C.G. testifying that Ms. Thomas gave him an opportunity to explain the post before suspending him).

There is a genuine dispute of material fact as to whether the initial suspension was made before C.G. spoke with Dean Thomas.  A reasonable jury could interpret Superintendent Siegfried's email to Principal Silva and other officials on Sunday evening, September 15, 2019—which included on a numbered list under Principal Silva's name, "5 day suspension from school"—as an instruction for Principal Silva to carry out the suspension.  ECF No. 84-2 at 50-

15

51. This interpretation would effectuate most naturally the grammatical context of the list, which included three other items, all beginning with imperatives ("pull," "provide," and "request").

However, a reasonable jury could also interpret that list in the context of the rest of the email—which instructed another official to obtain a copy of the police report and concluded, "[w]e can discuss after Ryan calls Carla with info in the morning"—as a suggestion of a possible course of action, to be finalized after Principal Silva spoke with the students and the officials reviewed the police report.  *See id*.; *see also* ECF No. 84-2 at 31 (Principal Silva telling a parent on Sunday night, after receiving Superintendent Siegfried's instructions, that the school officials "*will* make a decision as to what consequences are most appropriate") (emphasis added).  The decision to credit or not credit Principal Silva's statements to parents or Dean Thomas's deposition testimony that she "had not made the decision to suspend C.G. prior to meeting with him in person on September 16, 2019," *see* ECF No. 84-3 at 2, is squarely within the province of the factfinder.  To invade that role on summary judgment is inappropriate.

Moreover, even if it were undisputed that the suspension decision was made on Sunday night, before C.G. spoke with Dean Thomas on Monday morning, there remain additional questions of fact that preclude summary judgment.  It is possible that, under similar facts as those in the First Amendment *Tinker* analysis above, a jury could find under *Goss*'s notably less demanding standard that C.G.'s presence posed an "ongoing threat of disrupting the academic process."  *See* 419 U.S. at 583-84.  If so, the school could have been justified in providing only a post-suspension hearing, and the attendant fact question would be whether that hearing occurred "as soon as practicable" after the suspension.  *See id.*  A reasonable jury could find that C.G.'s apology post, his mother's emails to the school, the packet of information, and the eventual formal hearing collectively or in part fulfilled *Goss*'s requirements, or on the other hand, that

C.G.'s presence did not pose a threat and therefore that a post-suspension hearing was not constitutionally adequate. Resolution of these sub-questions at the summary judgment stage is inappropriate.

Therefore, the cross motions for summary judgment on the due process claims regarding the suspension up to 10 days are both denied.

### b. Longer-term suspension and expulsion.

The adequacy of process regarding C.G.'s suspension extension and eventual expulsion fall outside the purview of *Goss* and instead are reviewed under *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). C.G. does not specify in his motion for summary judgment what facts would show that the process was unconstitutional under *Mathews*, but rather simply asserts that the school "afforded C.G. no process—much less one that satisfies the *Mathews* standard—before extending his suspension for eleven additional days." ECF No. 85 at 17.

The only specific argument C.G. makes about the expulsion process is that "there is no authority that a disciplinary decision made a month after the triggering event can be justified by forecasted disruption." ECF No. 89 at 6-7. This argument uses the wrong standard—referencing *Goss* rather than *Mathews*—and moreover is internally inconsistent, implying both that the expulsion would have had to occur sooner to be permissible and simultaneously that additional pre-decision process was required. Because C.G. does not specify what additional process would have been required to enhance the accuracy of the expulsion decision or otherwise promote the objectives of due process, let alone support those arguments with reference to evidence in the record, summary judgment in his favor on this issue is not warranted.

Likewise, the school has not identified any evidence of its considerations in entering the suspension extension, such as "(1) the student's interest in returning to school and avoiding

further reputational harm; (2) the likely value of additional or substitute procedure; and (3) the administrative and fiscal burden of such procedure." *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1240 (10th Cir. 2001).  Therefore, I lack any basis to grant summary judgment in defendants' favor either.  The cross motions for summary judgment on the due process claims regarding the longer-term suspension and expulsion are denied.

## ORDER

For the reasons above, plaintiff's and defendants' cross motions for summary judgment, ECF Nos. 84 and 85, are denied .

DATED this 31st day of October, 2023.

BY THE COURT:

_____
R. Brooke Jackson
Senior United States District Judge